**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **BLITZSAFE TEXAS, LLC,** | § | |
| | § | |
| Plaintiff, | § | **Case No. 2:17-cv-00430-JRG** |
| | § | **(LEAD CASE)** |
| v. | § | |
| | § | |
| **MITSUBISHI ELECTRIC** | § | **JURY TRIAL DEMANDED** |
| **CORPORATION, ET AL.,** | § | |
| | § | |
| Defendants. | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| **BLITZSAFE TEXAS, LLC,** | § | |
| | § | **Case No. 2:17-cv-00424-JRG** |
| Plaintiff, | § | |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| **TATA MOTORS LTD.,** | § | |
| **JAGUAR LAND ROVER LIMITED,** | § | |
| **JAGUAR LAND ROVER NORTH** | § | |
| **AMERICA, LLC,** | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF BLITZSAFE TEXAS, LLC'S
OPENING CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

Page(s)

I.     INTRODUCTION ............................................................................................... 1

II.    CLAIM CONSTRUCTION STANDARD OF REVIEW ................................... 2

    A.     Governing Law ....................................................................................... 2

    B.     Level of Ordinary Skill in the Art........................................................... 3

III.   PATENT BACKGROUND AND TECHNOLOGY ........................................... 3

    A.     Overview of the '786 Patent ................................................................... 3

    B.     Overview of the '342 Patent ................................................................... 4

IV.    AGREED UPON CONSTRUCTIONS ............................................................. 4

V.     DISPUTED TERMS ......................................................................................... 7

    A.     "interface" .............................................................................................. 7

    B.     "integration subsystem" ....................................................................... 11

        1.     "Integration Subsystem" Is Not a Means-Plus-Function Term
           and Has Already Been Properly Construed ............................... 12

        2.     Even if "Integration Subsystem" Were to Invoke 35 U.S.C.
           § 112(6) the Term is Not Invalid Under 35 U.S.C. § 112(2) ................... 16

    C.     "Audio Generated by" Terms ............................................................... 18

    D.     "formatted command"/ "formatted control command"/ "formatted
        control signal".......................................................................................... 20

    E.     "after-market [audio/video] device" ................................................... 21

    F.     "video information" .............................................................................. 24

    G.     "connector electrically connectable to" / "electrical connector" /
        "connectable"......................................................................................... 25

VI.    CONCLUSION................................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abstrax, Inc. v. Hewlett-Packard Co.*,
No. 2:14-cv-158-JRG, 2015 WL 156555 (E.D. Tex., Jan. 12, 2015) .....................................25

*Adidas AG v. Under Armour, Inc.*,
No. 1:14-cv-00130, D.I. 201 (D. Del., Dec. 15, 2015) ......................................................10, 14

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014) (overruled on other grounds) ................................................16

*Aristocrat Techs. Aus. Pty Ltd. v. Int'l Game Tech.*,
521 F.3d 1328 (Fed. Cir. 2008) ...............................................................................................17

*Coho Licensing LLC v. Glam Media, Inc.*,
No. C 14-01576 JSW, 2017 WL 6210882 (N.D. Cal., Jan. 23, 2017) ..................11, 12, 14, 15

*Cordis Corp. v. Boston Sci. Corp.*,
561 F.3d 1319 (Fed. Cir. 2009) ...............................................................................................14

*Finisar Corp. v. DirecTV Grp., Inc.*,
523 F.3d 1323 (Fed. Cir. 2008) .................................................................................................2

*Huawei Tech. Co. Ltd. v. T-Mobile US, Inc.*,
No. 2:16-cv-00055-JRG-RSP, 2017 WL 2190103 (E.D. Tex., May 17, 2017) ........................2

*Interdigital Comm. Inc. v. Nokia Corp.*,
No. 1:13-cv-00010-RGA, 2014 WL 8104167 (D. Del., Sept. 19, 2014) ...........................10, 14

*Markman v. Westview Instruments, Inc.*,
517 U.S. 370 (1996) ....................................................................................................2, 18, 21

*Maurice Mitchell Innovations, LP v. Intel Corp.*,
No. 2:04-CV-450, 2006, WL 1751779 (E.D. Tex., Jun. 21, 2006) ...........................................2

*In re Papst Licensing Digital Camera Patent Litig.*,
778 F.3d 1255 ..........................................................................................................................25

*Pragmatus AV, LLC v. Yahoo! Inc.*,
No. C-13-1176, 2014, WL 1922081 (N.D. Cal., May 13, 2014) ........................................10, 14

*Seoul Semiconductor Co. Ltd. v. Nichia Corp.*,
596 F. Supp. 2d 1005 (E.D. Tex., Feb. 6, 2009) .......................................................................2

*TQP Development, LLC v. Inuit Inc.*,
    No. 2:12-CV-180, 2014 WL 2810016 (E.D. Tex., June 20, 2014)............................................2

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015)......................................................................................12, 13

**Statutes**

35 U.S.C. § 112...................................................................................................................11, 12, 16

**Other Authorities**

*American Honda Motor Co., Inc. v. Blitzsafe Texas, LLC*,
    IPR2018-01473 (P.T.A.B., Jan. 24, 2017)...............................................................................14

*BMW of North America, LLC. v. Blitzsafe Texas, LLC*,
    IPR2018-01142 (P.T.A.B., Nov. 26, 2018) ........................................................................9, 10

Pursuant to P.R. 4-5(a) and the Court's November 8, 2018, Docket Control Order (Dkt. 168), Plaintiff Blitzsafe Texas, LLC ("Blitzsafe") hereby submits its Opening Claim Construction Brief.  The asserted patents in the above-captioned matter are U.S. Patent Nos. 7,489,786 (the "'786 Patent") and 8,155,342 (the "'342 Patent") (together, the "Asserted Patents").  The inventor of the Asserted Patents is Ira Marlowe.

## I.     INTRODUCTION

This Court has twice construed the claims of the Asserted Patents: first in *Blitzsafe Texas, LLC v. Honda Motor Co. Ltd.*, *et al.*, Case No. 2:15-cv-01274-JRG-RSP (the "*Honda* litigation"), and then in *Blitzsafe Texas*, *LLC v. Subaru Corp.*, *et al.*, Case No. 2:17-cv-00421-JRG-RSP (the "*Subaru* litigation").  Defendants now seek to re-litigate constructions that this Court has decided, or to which the parties have previously agreed, in an attempt to narrow the scope of the claims and create non-infringement arguments.

Defendants' intent is obvious.  These Defendants, and the defendants in the *Honda* litigation, took their best shot at invalidating the Asserted Patents by filing 24 *inter partes* review petitions ("IPR") in the PTAB.  These IPRs resulted in the cancellation of zero claims.  The only IPR in which a challenge to the claims of the '342 Patent was instituted, IPR2016-00418 (the "418 IPR"), was settled two years ago.  Then, shortly after the instant cases were filed, Defendants essentially refiled the 418 IPR, and the PTAB *denied institution*.  Nine more IPRs of dubious quality followed, and all were denied institution.  Now that all of Defendants' IPRs have failed and they have little prospect of invalidating any claims of the Asserted Patents, Defendants have shifted their focus to narrowing the claims of the Asserted Patents to bolster their non-infringement arguments without risk of sacrificing invalidity arguments which are virtually non-existent.

Rather than permit Defendants to rewrite the claims of the Asserted Patents, this Court should defer to its prior claim constructions.  Prior claim construction proceedings involving the same Asserted Patents are "entitled to reasoned deference under the broad principals of *stare decisis* and the goals articulated by the Supreme Court in *Markman*, even though *stare decisis* may not be applicable *per se*." *Maurice Mitchell Innovations*, *LP v. Intel Corp*., No. 2:04-CV-450, 2006, WL 1751779, at *4 (E.D. Tex., Jun. 21, 2006) (Davis, J.).  The Court's prior constructions are entitled to substantial weight, and the Court should decline to depart from those constructions because, as demonstrated below, Defendants have not demonstrated any need to do so.  *See TQP Development*, *LLC v. Inuit Inc*., No. 2:12-CV-180, 2014 WL 2810016, at *6 (E.D. Tex., June 20, 2014) (Bryson, J.) ("[P]revious claim constructions in cases involving the same patent are entitled to substantial weight, and the Court has determined that it will not depart from those constructions absent a strong reason for doing so."); *see also Finisar Corp*. *v*. *DirecTV Grp*., *Inc*., 523 F.3d 1323, 1329 (Fed. Cir. 2008) (noting "the importance of uniformity in the treatment of a given patent") (quoting *Markman v*. *Westview Instruments*, *Inc*., 517 U.S. 370, 390 (1996)).

## II.     CLAIM CONSTRUCTION STANDARD OF REVIEW

### A.     Governing Law

The governing legal standards relating to claim construction are described, for example, in the Court's opinion in *Huawei Tech. Co. Ltd. v. T-Mobile US*, *Inc*., No. 2:16-cv-00055-JRG-RSP, 2017 WL 2190103 (E.D. Tex., May 17, 2017), and are hereby incorporated by reference. *See also Seoul Semiconductor Co. Ltd. v. Nichia Corp*., 596 F. Supp. 2d 1005 (E.D. Tex., Feb. 6, 2009).

### B.      Level of Ordinary Skill in the Art

The "Field of Disclosure" is described generally as "an audio device integration system" in the '786 Patent and the '342 Patent.  The detailed descriptions of the inventions and the claims of the Asserted Patents draw on a combination of skills.  Blitzsafe submits that a person of ordinary skill in the art covered by the patents-in-suit would have a Bachelor's degree in electrical engineering or equivalent degree, and at least two years of experience in signal processing and/or electronic devices with interfaces and/or experience with media communication in the context of automotive applications.  Extensive experience and technical training may substitute for educational requirements, while advanced education might substitute for experience.

## III.     PATENT BACKGROUND AND TECHNOLOGY

### A.      Overview of the '786 Patent

The '786 Patent issued on February 10, 2009, from Application No. 10/316,961 (the "'961 Application"), filed on December 11, 2002.  The '786 Patent pertains to an audio device integration system that enables after-market audio products, which are not specifically designed for use in an automobile, such as CD players, CD changers, MP3 players, satellite receivers, digital audio broadcast receivers, and auxiliary input sources, to be connected to, operated with, and be controlled from, an existing stereo system in an automobile.  The interface allows vehicle users to seamlessly integrate one or more portable electronic devices with an automobile stereo system such that the user can access, manage, and communicate audio and video content using the automobile's controls, and to enjoy audio and video generated by the external device via the car stereo's speakers and display.  The '786 Patent provides the convenience of integrating an array of audio devices into one centrally-controlled system, saving users the distraction and annoyance of toggling between the controls of incompatible components.

### B.      Overview of the '342 Patent

The '342 Patent was issued from a continuation-in-part application, claiming priority to the '961 Application.  *See* '342 Patent, "Related U.S. Application Data."  The '342 Patent relates to a multimedia device integration system that allows a plurality of portable electronic devices to be wirelessly integrated into an existing car stereo system, via an "integration subsystem," while allowing information to be displayed on, and control to be provided from the car stereo.  *See*, the '342 Patent, at 2:44–54, 33:43–46; Abstract.  The integration subsystem can be positioned in communication with the portable device or in communication with the car audio/video system, allowing data and control signals to be exchanged between the portable device and the car audio/video system.  Similar to the interface of the '786 Patent, the integration subsystem processes and formats data so that instructions and information are processed by the portable device and vice versa, and permits audio and video generated by the portable device to be played on the car audio/video system.  *Id*. at 33:43—35:62, Figs. 18, 19.  The invention of the '342 Patent provides the same convenience of the '786 Patent with the added benefit of wireless integration.

## IV.     AGREED UPON CONSTRUCTIONS

| Term(s) | Claims of the Asserted Patents | Agreed-Upon Construction |
|---|---|---|
| "integration" / "integrating" | '786 Patent, claims 1, 5, 57, 86 | "connecting one or more external devices or inputs to an existing car radio or stereo via an interface, processing and handling signals and audio channels, allowing a user to control the devices via the car stereo, and displaying data from the devices on the radio." |

| Term(s) | Claims of the Asserted Patents | Agreed-Upon Construction |
|---|---|---|
| "integration" / "integrating" | '342 Patent, claims 49, 50, 53, 54, 56, 66, 70, 73, 74, 77, 78, 79, 80, 94, 97, 99, 102, 103, 106, 113, 120 | "connecting one or more external devices or inputs to an existing car stereo or video system via an interface, processing and handling signals, audio, and/or video

information, allowing a user to control the devices via the car stereo or video system, and displaying data from the devices on the car stereo or video system" |
| "auxiliary input source" | '786 Patent, claims 1, 14 | "a device that outputs audio by headphone jack or other connector" |
| "car stereo" | '786 Patent, claims 1, 2, 6, 13, 14, 57, 58, 60, 63, 86, 90, 91 | "all presently existing car stereos and radios, such as physical devices that are present at any location within a vehicle, in addition to software and/or graphically-or-display-driven receivers. An example of such a receiver is a software-driven receiver that operates on a universal LCD panel within a vehicle and is operable by a user via a graphical user interface displayed on the universal LCD panel. Further, any future receiver, whether a hardwired or a software/graphical receiver operable on one or more displays, is considered within the definition of the terms 'car stereo' and 'car radio'" |
| "device presence signal" | '786 Patent, claims 6, 57, 86

'342 Patent, claims 56, 106 | "a continuously transmitted signal indicating an audio device is present" |

| Term(s) | Claims of the Asserted Patents | Agreed-Upon Construction |
|---|---|---|
| "portable" | '786 Patent, claims 57<br><br>'342 Patent, claims 49, 52, 53, 54, 56, 57, 62, 63, 64, 66, 70, 71, 73, 76, 77, 78, 80, 94, 95, 97, 100, 101, 103, 106, 109, 110, 111, 113, 115, 120 | "capable of being moved about" |
| "pre-programmed" | '786 Patent, claims 1, 7, 8, 57, 60, 86, 90, 91 | Plain and ordinary meaning |
| "connectable" | '786 Patent, claims 1, 57, 86 | Plain and ordinary meaning |
| "channeling audio signals" / "audio signals . . . are selectively channeled" / "channeling audio" / "channels audio" / "channels video | '786 Patent, claims 1, 14<br><br>'342 Patent, claims 97, 99, 113, 120 | "receiving and transmitting audio" or "receives and transmits [audio/video]" |
| "maintain … in an operational state" | '786 Patent, claims 57, 86 | "preventing the car stereo from shutting off, entering a sleep mode, or otherwise being unresponsive to signals and/or data from an external source" |
| "maintaining . . . in a state responsive" /<br><br>"maintain . . . in a state responsive" | '786 Patent, claim 6<br><br>'342 Patent, claims 56, 106 | "preventing the car stereo from shutting off, entering a sleep mode, or otherwise being unresponsive to signals and/or data from an external source" |
| "external" | '786 Patent, claims 1, 57, 86<br><br>'342 Patent, claims 49, 73, 97, 120 | "outside and alien to the environment of an OEM or after-market stereo system (and not limited to devices that were not made to work in automobiles)" |
| "car audio/video system" | '342 Patent, claims 49–51, 53, 54, 56, 66, 70, 73–75, 77, 78, 94, 97, 99, 106, 113, 120 | Plain and ordinary meaning |

| Term(s) | Claims of the Asserted Patents | Agreed-Upon Construction |
|---|---|---|
| "format incompatible with the [after-market audio device, MP3 player, portable device, video device, portable audio device, car stereo, car audio/video system]" | '786 Patent, claims 1, 57, 90<br><br>'342 Patent, claims 53, 57, 77, 97 | "format incompatible with" means "a format not designed to work with" |
| "format incompatible with the [car stereo / car audio/video system]: | '786 Patent, claims 1, 60<br><br>'342 Patent, claims 54, 70, 78, 120 | "format incompatible with" means "a format not designed to work with" |

## V.    DISPUTED TERMS

### A.    "interface"

| Blitzsafe's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a device that includes a microcontroller and that is a functionally and structurally separate component from the car stereo, which integrates an external aftermarket device with a car stereo" | "a device that includes a microcontroller and that is a functionally and structurally separate component from the car stereo and housed separately from the car stereo, which integrates an external aftermarket device with a car stereo." |

The term "interface" is recited in asserted claims 1, 5, 6, 10, 14, 23, 57, 64, 86, 88, 92, and 97 of the '786 Patent.

The independent device claims of the '786 Patent, provide:

an *interface* connected between said first and second electrical connectors for channeling audio signals to the car stereo from the after-market audio device, said interface including a microcontroller in electrical communication with said first and second electrical connectors . . .

'786 Patent, claims 1, 25, 44, 57, 66, 76, 86, 92, 99 (emphasis added).

This Court previous construed this term in the *Honda* litigation and Blitzsafe proposes that same construction, *i.e.*, "a device that includes a microcontroller and that is a functionally

and structurally separate component from the car stereo, which integrates an external aftermarket device with a car stereo." *See* Exhibit A, *Blitzsafe Texas, LLC v. Honda Motor Co. Ltd.*, *et al.*, No. 2:15-cv-01274-JRG-RSP, Judge Payne's Claim Construction Memorandum Opinion and Order, Dkt. 146 at 15–19 (E.D. Tex., Sept. 13, 2016) ("*Honda* CC Order").[1]   Blitzsafe and Subaru agreed to this construction in *Blitzsafe Texas, LLC v. Subaru Corp.*, *et al.*, No. 2:17-cv-00421-JRG-RSP, Judge Payne's Claim Construction Memorandum Opinion and Order, Dkt. 109 at 14–15 (E.D. Tex., Dec. 11, 2018) ("*Subaru* CC Order").  *See* Exhibit B.  Defendants seek to inject an additional limitation—"housed separately from the car stereo"—even though the words "housed" or "housing" do not appear anywhere in the claims or specification of the '786 Patent.

Defendants' position has already been rejected by this Court.  In the *Honda* case, this Court decided, after an extensive review of the intrinsic record, that the interface is not required to be "external to the 'car stereo,' or physically separate from the 'physical devices' that make-up the 'car stereo.'"  Exhibit A, *Honda* CC Order at 21 (citing '786 Patent, 5:1–13).  A "housed separately" limitation in the construction would contravene this Court's prior findings.

Defendants point to Figures 1-2H of the '786 Patent to support the argument that the claimed interface must be "housed separately from the car stereo."  *See* Dkt. 197-3 at 1.  The patentee's presentation of the "interface" and "car radio" in separate blocks in these figures does not require that these components be housed separately, and interpreting these figures as connoting physical structure contradicts the specification.  Figure 2A depicts the car radio 10, display 13 and control panel buttons 14 as separate blocks, but the portion of the specification describing Figure 2A states that the display and control panel buttons *are part of the car radio*:

---

[1] This construction is identical to the construction adopted by the District of New Jersey in *Marlowe Patent Hldgs. v. Ford Motor Co.*, Case No. 3:11-cv-07044-PGS-DEA, Markman Order, Dkt. 110 at 1 (D.N.J., Jan. 20, 2015).  *See* Exhibit C.

"the car radio 10 *includes* a display 13 (such as an alphanumeric, electroluminescent display) for displaying information, and a plurality of control panel buttons 14 that normally operate to control the radio 10." '786 Patent at 5:45–49 (emphasis added). Thus, the separate boxes in these figures were not intended to depict whether structures are physically separate or housed separately.

Defendants also point to a statement by the Board in its decision denying institution of a prior IPR against the '786 Patent, IPR2018-01142 (the "1142 IPR"), as supporting the concept that the interface and car radio must be housed separately from the car stereo. *See* Dkt. 197-3 at 1. In that proceeding, the Board adopted a construction of "interface" formulated by the Board in a previous IPR: "a physical unit that connects one device to another and that has a functional and structural identity separate from that of both connected devices." *See* Exhibit D, IPR2018-01142, Decision Denying Institution of *Inter Partes* Review, Paper 8 (Nov. 26, 2018) at 7. Applying this construction, the Board determined that the "Petitioner had failed to show that the alleged 'interface' in either Herley or Ido satisfies the construction for the term []." *Id*. at 18. With respect to the Herley reference, the Board found that it was "silent as to a structural separation, if any, between the controller and any of the other depicted components." *Id*. at 17-18. As to the Ido reference, the Board found that Petitioner had failed to show disclosure of the interface because "the 'car stereo' and the 'interface' are housed together, there being no structural separation apparent *from any disclosure cited by Petitioner*." *Id*. at 18 (emphasis added). Ultimately, the Board did not determine that the "separate structural identity" of its construction requires that the car stereo and interface must be housed separately. The Board instead concluded that the Petitioner had failed to meet its burden to present evidence that the interface of Ido housed in a car stereo maintained a "structural identity separate from the car

radio." *Id*.  Defendants' present attempt to elevate Petitioner's failure of evidence to the status of a claim limitation should be rejected.

Defendants' attempt to import the Board's "housed separately from the car stereo" statement from the 1142 IPR into the construction of "interface" suffers from two additional flaws.  First, the statement is based on the Board's interpretation of a claim construction adopted in a prior IPR that was never litigated by the parties.  Patent Owner assumed that the Board would apply its prior claim construction for the purpose of the 1142 IPR and did not challenge the construction at that stage of the proceedings.  *Id*. at 7.  Because the 1142 IPR was not instituted, it was unnecessary for Patent Owner to address the Board's construction.

Second, Defendants' position presumes that the Board's statements have the force of a disclaimer or estoppel.  This is not so.  A Board's statements in an institution decision are not the statements of the Patent Owner and, therefore, cannot act as a disclaimer of claim scope.  *See Pragmatus AV*, *LLC v. Yahoo*! *Inc*., No. C-13-1176, 2014, WL 1922081, at *4 (N.D. Cal., May 13, 2014) ("Ultimately, what is important here is not what the PTAB said about the claim term [] but rather what [the patentee] said about the term in the proceedings before the PTAB and whether any disavowal or estoppel argument may be asserted based thereon.").  Moreover, a Board's interpretation of its own claim construction does not estop a Patent Owner from litigating its claim construction position in district court proceedings.  *See Adidas AG v. Under Armour*, *Inc*., No. 1:14-cv-00130, D.I. 201 at n.1 (D. Del., Dec. 15, 2015) ("The court is not bound by a preliminary claim construction used by the PTAB for the limited purpose of denying an IPR request."); *Interdigital Comm. Inc. v. Nokia Corp*., No. 1:13-cv-00010-RGA, 2014 WL 8104167, at *1 (D. Del., Sept. 19, 2014) (holding that a denial of institution is not a decision on the merits and is "akin to a ruling on a preliminary injunction, where the merits are assessed with

less than a full record and with less than a full adversarial proceeding"); *Coho Licensing LLC v. Glam Media, Inc.*, No. C 14-01576 JSW, 2017 WL 6210882, at *7 (N.D. Cal., Jan. 23, 2017) ("[T]he PTAB's decision not to institute an *inter partes* review has no preclusive effect for any finding of fact before this Court.").

Accordingly, Plaintiff requests that the Court adopt its previous construction and again order that "interface" should be construed as "a device that includes a microcontroller and that is a functionally and structurally separate component from the car stereo, which integrates an external aftermarket device with a car stereo."

### B.    "integration subsystem"

| Blitzsafe's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Not subject to 35 U.S.C. § 112(6) (pre-AIA).<br><br>"a subsystem that includes a microcontroller configured to integrate an external device with a car audio/video system" | Subject to 35 U.S.C. § 112(6) (pre-AIA).<br><br>Indefinite.<br><br>Alternatively, for the independent claims: "subsystem including a microprocessor programmed to perform the flow-diagram of FIG. 24";<br><br>"subsystem"<br><br>"system which is subordinate to another system and that is distinct from any other system (e.g., the car audio/video system)" |

The term "integration subsystem" is found in asserted claims 49, 50, 53, 57, 66, 70, 73, 77–79, 80, 97, 99, 102–103, 106, 113, and 120 of the '342 Patent.  For example, claim 49 recites:

> . . . an ***integration subsystem*** in communication with a car audio/video system . . . wherein said ***integration subsystem*** obtains, using said wireless communication link, information about an audio file stored on the portable device, transmits the information to the car audio/video system for subsequent display of the information of a display of the car audio/video system, instructs the portable device to play the audio file in response to a user selecting the audio file using controls of the car audio/video system, and received audio generated by the portable device over said wireless communication link for playing on the car audio/video system.

'342 Patent, at claim 49.

> The '342 Patent sets forth a definition for "integration" as follows:

> As used herein, the term "integration" or "integrated" is intended to mean connecting one or more external devices or inputs to an existing car stereo or video system via an interface, processing and handling signals, audio, and/or video information, allowing a user to control the devices via the car stereo or video system, and displaying data from the devices on the car stereo or video system.

*Id.*, at 8:64–9:3.

### 1.    "Integration Subsystem" Is Not a Means-Plus-Function Term and Has Already Been Properly Construed

This Court has already determined on two occasions that "integration subsystem" is not subject to 35 U.S.C. § 112(6) (pre-AIA), is not invalid under 35 U.S.C. § 112, ¶ 2, and should be construed to mean "a subsystem that includes a microcontroller configured to integrate an external device with a car audio/video system."  Exhibit B, "*Subaru* CC Order" at 38–47; *see also* Exhibit A, *Honda* CC Order at 23–28.  There is no reason to depart from the construction of "integration subsystem" that this Court has previously adopted.  *See TQP Development*, No. 2:12-CV-180, 2014 WL 2810016, at *6 ("[P]revious claim constructions in cases involving the same patent are entitled to substantial weight, and the Court has determined that it will not depart from those constructions absent a strong reason for doing so.")

This Court has twice rejected arguments that "integration subsystem" is a means-plus-function term.  Like the earlier proponents of this failed argument, Defendants cannot overcome the presumption against the application of § 112, ¶ 6 that must be applied since none of the claims of the '342 Patent employ the word "means," including the claims reciting the phrase "integration subsystem."  *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015).

A person of ordinary skill in the art would have understood an integration subsystem to be a type of interface which the parties do not dispute to be a name for structure.  Ex. D, Declaration of Joseph C. McAlexander in Support of Blitzsafe Texas, LLC's Opening Claim Construction Brief, at ¶ 27; *see also id.* at ¶¶ 21–35.  The '342 Patent specification refers to the structure of an integration system as including "an interface" and describes the structure of the integration subsystem as containing "circuitry" that includes "the interface disclosed in Figure 3b, and discussed in the specification as including a microcontroller, a multiplexer/demultiplexer, resistors, capacitors, transistors, transformers, amplifiers, and oscillator, and other components."  *See* '342 Patent at 8:64–9:3, 14:27–59, 34:63–35:1; Exhibit E at ¶ 27.

This Court previously noted that "the integration subsystem is described as a discrete structure comprised of multiple structural components and not a 'black box' like the 'distributed learning control module' in *Williamson*."  Exhibit B, *Subaru* CC Order at 43; *see also* Exhibit A, *Honda* CC Order at 29–30).  The Court found that "integration subsystem" is not subject to § 112, ¶ 6, stating:

> [T]he specification further states that the "embodiments of the present invention discussed herein" include the interface disclosed in Figure 3b and discussed in the specification including the same 16F872 microcontroller, along with multiplexer/demultiplexer, resistors, capacitors, transistors, transformers, amplifiers, an oscillator, and other components. . . .  The Federal Circuit has held that "circuitry" connotes structure to those in the electronic arts in the context of the § 112(6) analysis."

Exhibit B at 43 (citations omitted).

As with "interface," Defendants again cite to a non-binding and non-preclusive statement by the PTAB in IPR proceedings in an attempt to support reading a limitation into the claims that contravenes a prior construction of this Court.  Defendants ask this Court to impose the

requirement that the integration subsystem must be "a system *distinct* from any other system (e.g., the car audio/video system)" based on an identical statement by the Board in IPR2016-01473 (the "1473 IPR").  *See* Exhibit F, Decision Denying Institution, Paper 9 (Jan. 24, 2017) at 11-12.  This Court previously found in both the *Honda* and *Subaru* cases that "the intrinsic evidence does not show the 'integration subsystem' has to be a functionally and structurally separate component from the 'car stereo'" (Exhibit A, *Honda* CC Order at 31; *see also* Exhibit B, *Subaru* CC Order at 44), and the 1473 IPR decision (which was available when the *Subaru* claim construction disputes were being briefed) should not alter that construction.  *See Pragmatus,* 2014 WL 1922081, at *4; *Adidas AG*, No. 1:14-cv-00130, D.I. 201 at n.1; *Interdigital* 2014 WL 8104167, at *1; *Coho Licensing*, 2017 WL 6210882, at *7.  This Court should reject Defendants' proposed construction as an attempt to improperly inject "structural and functional separation" into the claims of the '342 Patent.

The Board's statement that the integration subsystem must be a distinct component from any other system is not supported by the intrinsic record.  The Board cited to two embodiments in which the portable device and car audio/video system, respectively, contain device electronics in addition to the circuitry of the integration subsystem.  *See* Exhibit F, 1473 IPR, Paper No. 9 at 11 (citing '342 Patent, 34:9-13, 35:21-28, Figs. 18, 19).  The mere disclosure that each system contains its own electronics in addition to the integration subsystem does not compel the conclusion apparently sought by Defendants that no circuitry can be shared by the integration subsystem and any other system.  Nothing in the specification supports what would need to be a clear and unmistakable disavowal of claim scope to support Defendants' position.  *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009) (holding that to disavow or disclaim

the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender).

The extrinsic evidence cited by the Board also fails to supports its conclusion. The dictionary definitions of "subsystem" quoted by the Board were: (1) "[a] system which is subordinate to another system;" (2) "[a] system which is a part of, or assists, a larger system;" and (3) "a portion of a system that can be treated as a single element in the main system, but that can also be considered a distinct system itself". Exhibit F, 1473 IPR, Paper 9 at 10-11. While one definition acknowledges that a subsystem *can* be considered a distinct system, *id.* at 11, none of these definitions mandates a finding that the plain and ordinary meaning of "subsystem" is that it is distinct from all other systems as Defendants contend.

Finally, these definitions also demonstrate that a "subsystem" is not necessarily "subordinate" to another system as Defendants contend. Rather, a "subsystem" may simply be "a part of, or assist[],a larger system," or can be a "portion" of another system. *Id.* at 10-11. These potential interpretations are consistent with the specification and with the claim language requiring only that the integration subsystem be "in communication with" the car audio/video system or portable device. *See, e.g.*, '342 Patent, claims 1, 49. The Court previously included the term "subsystem" in its construction of "integration subsystem," declining to adopt Blitzsafe's proposed construction of "one or more components of a system or device" in the *Honda* matter. *See*, Exhibit A, *Honda* CC Order at 23 (setting forth Blitzsafe's proposed construction). Including the term "subsystem" in the construction of "integration subsystem" was sufficient in the *Honda* and *Subaru* matters, and it should be sufficient here.

As before, Blitzsafe's proposed construction is firmly rooted in the intrinsic record, and Blitzsafe requests that the Court stand by its prior construction of "integration subsystem" as "a

subsystem that includes a microcontroller configured to integrate an external device with a car audio/video system."

### 2. Even if "Integration Subsystem" Were to Invoke 35 U.S.C. § 112(6) the Term is Not Invalid Under 35 U.S.C. § 112(2)

Even if the term "integration subsystem" were determined to be defined solely by its function, Defendants must prove by clear and convincing evidence that the claim is invalid under 35 U.S.C. § 112(2). Defendants' argument fails because Figure 24 describes an algorithm that details the operation of the integration subsystem, and provides sufficiently definite structure for all alleged functions as a whole. *See* Exhibit E, ¶¶ 28-34. Figure 24 is exactly the type of "outline of an algorithm, a flowchart, or a specific set of instructions or rules" that satisfies the requirement for "computer-implemented" mean-plus-function terms. *See Apple Inc*. *v*. *Motorola*, *Inc*., 757 F.3d 1286, 1298 (Fed. Cir. 2014) (overruled on other grounds). Blitzsafe's position is corroborated by its expert, Mr. McAlexander, who confirms that one of ordinary skill in the art would readily understand how to implement the algorithm from the disclosure of Figure 24 to accomplish the alleged functions. *See* Exhibit E, ¶¶ 28-34.

Moreover, to the extent each of the alleged functions is taken independently, the specification provides support in addition to that which is described in Figure 24. For example, the alleged functions of "(1a) **obtaining**, using a wireless communication link, information about an audio file stored (claim 49) or received (claim 73)," "(2a) **transmitting** the information to the car audio/video system for subsequent display," and "(4a) **receiving** audio generated by the portable device over the wireless communication link" can all be accomplished by electrical hardware such as the "wireless communication link" itself. Exhibit E, ¶ 30. In these instances where the means-plus-function term is not "computer implemented," an algorithm is unnecessary

-16-

and a description of hardware satisfies the definiteness requirement.  *See*, *e.g.*, *Aristocrat Techs. Aus. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1337-38 (Fed. Cir. 2008).

To the extent any alleged functions remain that in isolation may require an algorithm, such as "(3a) instructing the portable device to play the audio file in response to a user selecting the audio file," these alleged functions are supported by algorithms and specific source code found in the specification.  '342 Patent, claim 1.  For example, a description of additional exemplary algorithms is found in columns 22–25 with references to the source code in Table 1:

> As mentioned previously, to enable integration, the present invention contains logic for converting command signals issued from an after-market or OEM car stereo into a format compatible with one or more external audio devices connected to the present invention.  Such logic can be applied to convert any car stereo signal for use with any external device.  For purposes of illustration, a sample code portion is shown in Table 1, below, for converting control signals from a BMW car stereo into a format understandable by a CD changer.

'342 Patent at 22:7-16; Ehibit E, ¶ 33.  Another algorithm and supporting code are described as present in Table 2:

> Additionally, the present invention contains logic for retrieving information from an after-market audio device, and converting same into a format compatible with the car stereo for display thereby.  Such logic can be applied to convert any data from the external device for display on the car stereo.  For purposes of illustration, a sample code portion is shown in Table 2, below, for converting data from a CD changer into a format understandable by a BMW car stereo

'342 Patent at 22:60–67.  Exhibit E, ¶ 34.  Figures 4 and 5 further describe logic including connecting audio channels to the head unit for playback.  These figures and the accompanying description in columns 16 through 26 describe an algorithm used in connection with "channeling" or "linking" hardware such as a wireless interface, "port J1," "port J2," and various

"multiplexers."   *See*, *e.g.*, *id*., at 15:3–6, 8–21; 16:1–5; *see also* Exhibit B, ¶¶ 33-34.

Accordingly, even if "integration subsystem" invokes § 112(6), Figure 24 discloses sufficient

corresponding structure to render "integration subsystem" definite.

### C.   "Audio Generated by" Terms

| Disputed Term | Blitzsafe's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "generated by the portable device over the [or said] wireless communication link for playing on the car audio/video system" | "produced by the portable device, and received by the integration subsystem, as decoded audio signals for playing on the car audio/video system" | "receives decoded audio[video] signals produced by the portable device and transmitted using the[or said] wireless communication link for playing on the car audio/video system without further audio [video] decoding" |
| "generated by the portable device to the car audio/video system using the wireless communication link" | | "transmits decoded audio signals produced by the portable device, and received by the integration subsystem, to the car audio/video system using the wireless communication link for playing on the car audio/video system without further audio decoding" |

The "Audio Generated by" terms appear in claims 49, 66, 73, 94, 97, and 120 of the '342

Patent.   Blitzsafe proposes that these phrases be construed to mean "produced by the portable

device, and received by the integration subsystem, as decoded audio signals for playing on the

car audio/video system."   This construction was offered by the Court at the *Markman* hearing in

the *Subaru* matter and accepted by both parties after discussion among the Court and the parties.

*See, generally*, Exhibit G, *Blitzsafe Texas LLC v. Subaru Corp. et al*., No. 2:17-cv-0421-JRG-

RSP, Oct. 31, 2018 Transcript of Claim Construction Hearing Before the Honorable Judge Roy

S. Payne United States Magistrate Judge at 79:3–87:19.

At the *Subaru* hearing, Blitzsafe agreed to the construction it proposes now for two reasons.  First, it is consistent with Blitzsafe's understanding that generating audio by a portable device from an audio file requires that the portable device decode the audio file into decoded audio signals.  *See* Exhibit G at 80:16-22.  Second, it requires that the integration subsystem receives decoded audio signals that do not need further decoding in order to be played in the car audio/video system.  *See id.* at 80:22-25, 84:3-7.  The Court and Subaru acknowledged that while no further decoding may take place at the integration subsystem after the decoded audio signals are received by the integration subsystem, this limitation does not preclude processing of the decoded audio signal by the car audio/video system to render audio.  *See id.* at 84:20-87:15.

Defendants' proposed constructions are ambiguous and, if adopted, would be unhelpful to a jury.  Defendants' constructions begin with the verbs "receives" and "transmits" and describe the actions of the integration subsystem, even though the claim terms begin with "generated" and describe the audio being received or channeled.  Thus, the constructions do not properly define the limitations being construed.  Moreover, the limitation "for playing on the car audio/video system without further audio decoding" injects ambiguity into the construction because it is unclear whether the constructions require that the audio is received or transmitted without further decoding, or simply that the integration subsystem does not further decode it before it is played by the car audio/video system.

Accordingly, Blitzsafe respectfully requests that the Court reject Defendants' proposed constructions and adopt Blitzsafe's proposed construction for the "Audio Generated by" terms.

### D.    "formatted command"/ "formatted control command"/ "formatted control signal"

| Blitzsafe's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "new and different [control] command that is in a format compatible with the [after-market audio device / portable device / MP3 player]" |

The phrases "formatted command," "formatted control command," and "formatted control signal" appear in claims 1, 57, 90, and 92 of the '786 Patent and claims 53, 57, and 97 of the '342 Patent.  For example, claim 1 of the '786 Patent recites,

> a first preprogrammed code portion for remotely controlling the after-market audio device using the car stereo by receiving a control command from the car stereo through said first connector in a format incompatible with the after-market audio device, processing the received control command into a *formatted command* compatible with the aftermarket audio device, and transmitting the *formatted command* to the after-market audio device through said second connector for execution by the after-market audio device.

A person of ordinary skill in the art would have reasonable certainty about the scope of the terms "formatted command," "formatted control command," and "formatted control signal" in the context of the claims.  Specifically, the claims state that a "formatted control command" is the result of processing an incompatible command into one that is compatible with the aftermarket audio device.  As this Court held in the *Honda* case when construing the "format incompatible" terms in the same claims, one of ordinary skill in the art would understand "compatible" to mean "designed to work with another device or system without modification." Exhibit A, *Honda* CC Order at 58 (citations omitted).  With this understanding, the Court found that the remainder of the claim phrase does not require explanation or clarification.  *See id.* Accordingly, these terms should be construed according to their plain and ordinary meaning.

Defendants' construction relies on a decision of the PTAB to inject the narrowing phrase, "new and different," into the claims.  *See* Exhibit D, 1142 IPR, Paper 8 at 14-16.  This

construction should be rejected because "new and different" implies that the formatted control command must not only be "different" than the inputted command, but must also be "new."  The Board noted that the specification refers to a formatted command outputted by an exemplary code portion for converting control commands as "new."  *See* '786 Patent, 17:67–18:2; Exhibit D, 1142 IPR, Paper 8 at 15.  The Board later stated that to meet the claims, the command received from the car stereo must be "different" from the formatted control command issued to the device.  *See* Exhibit D, 1142 IPR, Paper 8 at 15–16.  Thus, the Board used the terms "new" and "different" interchangeably or synonymously.  Defendants' construction, however, imposes a dual requirement that has no support in the intrinsic record and is ambiguous.  As such, it should be rejected.

Because the plain meaning of "formatted command," "formatted control command," and "formatted control signal" would be reasonably clear to a person of ordinary skill in the art, Plaintiff requests that the Court construe this terms in accordance with its plain and ordinary meaning.

### E.    "after-market [audio/video] device"

| Blitzsafe's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning<br>Alternatively,<br>"an [audio/video] device that is not included in an automobile as sold by the original equipment manufacturer" | "[audio/video] equipment lacking specifically-designed wiring configuration for use only with custom designed connectors in the vehicle for that purpose." |

The term "after-market [audio/video] device" appears in claims 1, 4, 5, 7, 8, 10, 23, 26, and 86 of the '786 Patent.  The construction of the phrase "after-market [audio/video] device"

was not addressed before this Court in the *Honda* litigation and for good reason.[2]  The meaning of "after-market [audio/video] device" is reasonably clear not only to a person of ordinary skill in the art, but also to your every day consumer.  As such, Blitzsafe requests that the Court construe this term in accordance with its plain and ordinary meaning.  To the extent that the Court believes construction is necessary to avoid ambiguity, Blitzsafe requests that the Court construe the term "after-market [audio/video] device" to mean "an [audio/video] device that is not installed in an automobile as sold by the original equipment manufacturer."

Blitzsafe's proposed constructions are supported by the intrinsic evidence.  In the very first paragraph of the specification, the '786 Patent states:

> More specifically, the present invention relates to an audio device integration system for integrating after-market components such as satellite receivers, CD players, CD changers, MP3 players, Digital Audio Broadcast (DAB) receivers, auxiliary audio sources, and the like with *factory-installed (OEM) or after-market* car stereo systems.

'786 Patent, 1:7-12.  Thus, the specification differentiates "aftermarket" systems with OEM systems because OEM systems are factory-installed.  The distinction between OEM and after-market devices permeates the specification.  *See, e.g.*, '786 Patent at 1:33-35 ("Even if the OEM radio is replaced with an after-market radio . . .").  Therefore, the term "aftermarket [audio/video] device" should be construed in accordance with its plain and ordinary meaning.

Defendants' proposed construction is another confusing attempt to create a non-infringement position by construing this term to mean "[audio/video] equipment lacking specifically-designed wiring configuration for use only with custom designed connectors in the vehicle for that purpose."  Presumably, Defendants seek to exclude portable devices used by a

---

[2] In the *Subaru* litigation, Blitzsafe agreed to a construction proposed by Subaru to simplify the issues for the *Markman* hearing in that case.  *See* Exhibit B, *Subaru* CC Order at 15.  Now that Defendants seek a construction that is divorced from its plain and ordinary meaning in an apparent attempt to manufacture a non-infringement argument, Blitzsafe proposes a construction that accurately reflects the plain and ordinary meaning of the term.

majority of consumers and which can be integrated with a car stereo in accordance with the claimed invention, such as iPods and iPhones. Defendants' convoluted definition for an easily understood term is not supported by the specification of the '786 Patent. The '786 Patent makes no mention of a "specifically-designed wiring configuration for use only with custom designed connectors in the vehicle for that purpose." While Figures 3A–3D of the '786 Patent demonstrate circuitry for integrating various devices with a car stereo according to the claimed invention, the descriptions of those figures do not indicate that such circuitry is "specifically-designed . . . for use only with custom designed connectors in the vehicle for that purpose."

Defendants point to the prosecution history of the '786 Patent to support their construction, but the cited portions are irrelevant to the proper construction of an "after-market device." In response to the examiner's rejection of certain claims as being anticipated or obvious over the Miyazaki reference, the patentee argued that Miyazaki did not disclose the claimed device presence signal. Exhibit H, '786 Patent File History, June 28, 2007 Response to Examiner at 35–36. The patentee explained that Miyazaki did not need, and therefore did not disclose, a device presence signal because the equipment units were specifically designed to work together as evidenced by "specially-designed wiring harness which is configured for use only with custom designed connectors positioned throughout a vehicle." *Id.* at 36. Thus, the patentee did not define an "after-market device" as one lacking a specific type of wiring harness. Rather, the patentee argued that the existence of such a wiring harness was evidence that a device presence signal is not disclosed in the reference.

Fundamentally, whether an audio/video device is an "after-market" product is not determined by its "wiring configuration." Blitzsafe, therefore, requests that the Court reject Defendants' incorrect, confusing construction in favor of the plain and ordinary meaning of

"after-market [audio/video] device."  Alternatively, if the Court determines that a construction is necessary, Blitzsafe respectfully requests that the Court construes this term as it is applied by the specification to mean "an [audio/video] device that is not included in an automobile as sold by the original equipment manufacturer."

### F.    "video information"

| Blitzsafe's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "Visual images" | Plain and ordinary meaning |

The term "video information" appears in asserted claims 10 and 86 of the '786 Patent. For example, claim 10 recites "[t]he apparatus of claim 1, wherein said interface processes video information generated by the after-market audio device."  '786 Patent, claim 10.

The scope of the parties' disagreement on the proper construction of this term is unclear. After reviewing the specification and prosecution history, this Court concluded in the *Honda* case that "a person of ordinary skill in the art would understand that 'video information' includes both static and moving visual images."  Exhibit A, *Honda* CC Order at 61.  Defendants' position is that "video information" should be assigned its plain and ordinary meaning, but Defendants have not identified why they disagree that "visual images" is the plain and ordinary meaning of "video information."  Nevertheless, as the Court's previous construction was proper, *id*. at 59–61, Defendants' position that "video information" should be given its plain and ordinary meaning should be rejected.

G.      **"connector electrically connectable to" / "electrical connector" / "connectable"**

| Blitzsafe's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a port that links separate components" |

The phrase "connector electrically connectable to" appears in asserted claims 1, 2, 4, 5, 57, and 86 of the '786 Patent, and unasserted claim 92, from which asserted claim 97 depends. In the *Honda* case, this Court assigned these terms their plain and ordinary meaning. Exhibit A, *Honda* CC Order at 61-65. The parties in the *Subaru* case agreed to that construction. Exhibit B, *Subaru* CC Order at 14. In view of the guidance in the claims and specification, and given this Court's prior construction, it is unnecessary to construe these terms because they are readily understood by one of ordinary skill in the art.

Furthermore, even if a construction is necessary, which it is not, Defendants' construction is improper because it impermissibly reads limitations from the specification into the claims by attempting to limit an "electrical connector" to a "port." *See In re Papst Licensing Digital Camera Patent Litig.*, 778 F.3d 1255, 1265 ("[W]e see nothing to take that embodiment outside the reach of the usual rule that claims are generally not limited to features found in what the written description presents as mere embodiments, where the claim language is plainly broader."). Defendants' own intrinsic support indicates that that a "port" is but one embodiment of an electrical connector. *See* '786 Patent at 8:31-64, 9:22-44 ("connectors are provided, *illustratively* indicated as ports . . . ports could be embodied by *any suitable electrical connector* known in the art") (emphasis added). The intrinsic record contains no evidence that patentee disavowed or disclaimed all connectors which are not ports. *See Abstrax*, *Inc. v. Hewlett-Packard Co.*, No. 2:14-cv-158-JRG, 2015 WL 156555, at *5–6 (E.D. Tex., Jan. 12, 2015) (finding that isolated instances of the proposed phrase in the intrinsic record and examples in the

specification of non-limiting embodiments of the invention do not establish clear and unambiguous disclaimer).  Accordingly, Defendants' construction should be rejected.

Defendants' construction should also be rejected because it assumes that one of ordinary skill in the art would understand that electrical connectors, by definition, link "separate components."  The Board's decision in the 1142 IPR, to which Defendants cite, does not support this proposition.[3]  The analysis of the "first connector" in the 1142 IPR follows the discussion of whether the Herley reference discloses an "interface" as construed by the Board—which construction requires a physical separateness between the interface and car stereo which is not part of this Court's construction.  *See* Exhibit D, 1142 IPR at 17-20.  When the Board opined, "As noted above, we are not persuaded that the alleged 'car stereo' (which Petitioner highlights in green) is physically separate from the controller such that there is a connector between them," it found that the claimed "first connector" is not disclosed because the prior art lacked the claimed separation between the alleged car stereo and interface.  *See id.* at 19-20.  The Board did not conclude that the first connector could not exist because electrical connectors may only link "separate components."

For these reasons, the Court should assign these terms their plain and ordinary meaning.

## VI.    CONCLUSION

For the foregoing reasons, Blitzsafe respectfully requests that the Court adopt its proposed constructions for the disputed terms and phrases of the '786 Patent and the '342 Patent.

Dated: March 13, 2019                              **BROWN RUDNICK LLP**

                                                   */s/ Alfred R. Fabricant*
                                                   Alfred R. Fabricant
                                                   NY Bar No. 2219392

---

[3] As noted above, a Board's statements in its institution decisions and its claim construction do not operate as an estoppel against, or disavowal by, a patent owner.  *See supra.* at 10-11.

Email: afabricant@brownrudnick.com
Lawrence C. Drucker
NY Bar No. 2303089
Email: ldrucker@brownrudnick.com
Peter Lambrianakos
NY Bar No. 2894392
Email: plambrianakos@brownrudnick.com
Vincent J. Rubino, III
NY Bar No. 4557435
Email: vrubino@brownrudnick.com
Joseph M. Mercadante
NY Bar No. 4784930
Email: jmercadante@brownrudnick.com
Alessandra C. Messing
NY Bar No. 5040019
Email: amessing@brownrudnick.com
Sarah G. Hartman
CA Bar No. 281751
Email: shartman@brownrudnick.com
Timothy J. Rousseau
NY Bar No. 4698742
Email: trousseau@brownrudnick.com
Shahar Harel
NY Bar No. 4573192
Email: sharel@brownrudnick.com
Danielle A. D'Aquila
New York Bar No. 5098587
Email: DD'Aquila@brownrudnick.com
John A. Rubino
NY Bar No. 5020797
Email: jrubino@brownrudnick.com
Daniel J. Shea
NY Bar No. 5430558
Email: dshea@brownrudnick.com
**BROWN RUDNICK LLP**
7 Times Square
New York, NY 10036
Telephone: 212-209-4800
Facsimile: 212-209-4801

Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
Jennifer L. Truelove
Texas State Bar No. 24012906
jtruelove@mckoolsmith.com

**McKOOL SMITH, P.C.**
104 East Houston Street, Suite 300
Marshall, Texas 75670
Telephone: 903-923-9000
Facsimile: 903-923-9099

**ATTORNEYS FOR PLAINTIFF**
**BLITZSAFE TEXAS, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that counsel of record who are deemed to have consented to electronic service are being served this 13th day of March, 2019, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

*/s/ Alfred R. Fabricant*
Alfred R. Fabricant