**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| BLITZSAFE TEXAS LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| MITSUBISHI MOTORS CORPORATION, | § | **CIVIL ACTION NO. 2:17-CV-00430-JRG** |
| MITSUBISHI MOTORS NORTH | § | **(LEAD CASE)** |
| AMERICA, INC., | § | |
| | § | |
| | § | |
| BAYERISCHE MOTOREN WERKE AG, | § | **CIVIL ACTION NO. 2:17-CV-00418-JRG** |
| BMW OF NORTH AMERICA, LLC, | § | (Member Case) |
| | § | |
| *Defendants.* | § | |

## CLAIM CONSTRUCTION
## MEMORANDUM AND ORDER

Before the Court is the Opening Claim Construction Brief (Dkt. No. 203) filed by Plaintiff

Blitzsafe Texas, LLC ("Plaintiff" or "Blitzsafe"). Also before the Court is the Responsive Claim

Construction Brief (Dkt. No. 206) filed by Defendants BMW of North America, LLC, Bayerische

Motoren Werke AG (collectively, "BMW"), Daimler AG, Mercedes-Benz USA, LLC

(collectively, "Daimler/MB"), Jaguar Land Rover Limited, Jaguar Land Rover North America,

LLC, Mazda Motor Corporation, Mazda Motor of America, Inc. d/b/a Mazda North American

Operations, Mitsubishi Motors Corporation, and Mitsubishi Motors North America, Inc. (all,

collectively, "Defendants").[1] Further before the Court is Plaintiff's reply (Dkt. No. 208).

The Court held a claim construction hearing on April 24, 2019.

---

[1] At the time of the April 24, 2019 claim construction hearing, the only remaining Defendants were BMW and Daimler/MB.

# TABLE OF CONTENTS

I.  Background ........................................................................................................... 3

II.  Legal Principles .................................................................................................... 4

III.  Agreed Terms ....................................................................................................... 9

IV.  Disputed Terms .................................................................................................. 12

   A. "interface" ........................................................................................................ 12

   B. "integration subsystem" ................................................................................... 18

   C. ". . . audio generated by . . ." ........................................................................... 23

   D. "formatted command," "formatted control command," and "formatted control signal" ..... 28

   E. "after-market [audio/video] device" ................................................................ 33

   F. "video information" ........................................................................................... 34

   G. "connector electrically connectable to," "electrical connector," and "connectable" ........... 34

V.  Additional Terms ................................................................................................ 38

VI.  Conclusion .......................................................................................................... 40

## I.    Background

Plaintiff has alleged infringement of United States Patent Nos. 7,489,786 ("the '786 Patent") and 8,155,342 ("the '342 Patent") (collectively, "the patents-in-suit"). Plaintiff submits that the patents-in-suit relate to integrating audio and multimedia devices with existing car stereo/video systems. (*See* Dkt. No. 203 at 3–4.)

The '786 Patent, titled "Audio Device Integration System," issued on February 10, 2009, and bears a filing date of December 11, 2002. Plaintiff submits that "[t]he '786 Patent provides the convenience of integrating an array of audio devices into one centrally-controlled system, saving users the distraction and annoyance of toggling between the controls of incompatible components." (*Id.* at 3.) The Abstract of the '786 Patent states:

> An audio device integration system is provided. One or more after-market audio devices, such as a CD player, CD changer, MP3 player, satellite receiver, DAB receiver, or the like, is integrated for use with an existing OEM or after-market car stereo system, wherein control commands can be issued at the car stereo and responsive data from the audio device can be displayed on the stereo. Control commands generated at the car stereo are received, processed, converted into a format recognizable by the audio device, and dispatched to the audio device for execution. Information from the audio device, including track, disc, song, station, time, and other information, is received, processed, converted into a format recognizable by the car stereo, and dispatched to the car stereo for display thereon. One or more auxiliary input sources can be integrated with the car stereo, and selected between using the controls of the car stereo. Both an audio device and one or more auxiliary input sources can be integrated together, and a user can select between the device or the one or more auxiliary input sources by issuing selection commands through the car stereo. A docking station is provided for docking a portable audio or video device for integration with the car stereo.

The '342 Patent, titled "Multimedia Device Integration System," issued on April 10, 2012, and is a continuation-in-part of a continuation-in-part of a continuation-in-part of the '786 Patent. Plaintiff submits that "[t]he invention of the '342 Patent provides the same convenience of the '786 Patent with the added benefit of wireless integration." (*Id.* at 4.)

The Abstract of the '342 Patent states:

> An [*sic*] multimedia device integration system is provided. One or more after-market audio or video devices, such as a CD player, CD changer, digital media device (e.g., MP3 player, MP4 player, WMV player, Apple iPod, portable media center, or other device) satellite receiver (e.g., XM or Sirius receiver), DAB receiver, video device (e.g., DVD player), cellular telephone, or any other device or combinations thereof, is integrated for use with an existing OEM or after-market car stereo or video system, wherein control commands can be issued at the car stereo or video system and data from the after-market device can be displayed on the car stereo or video system. Control commands generated at the car stereo or video system are received, processed, converted into a format recognizable by the after-market device, and dispatched to the after-market device for execution. Information from the after-market device is converted into a format recognizable by the car stereo or video system, and dispatched to the car stereo or video system for display thereon. One or more auxiliary input sources can be integrated with the car stereo or video system, and selected using the controls of the car stereo or video system. A docking station is provided for docking a portable audio or video device for integration with the car stereo or video system. Wireless integration between the portable audio or video device and a car stereo or video system is provided, and voice recognition and speech synthesis capabilities are provided in the portable audio or video device or the car stereo or video system.

The Court previously construed terms of the patents-in-suit in *Blitzsafe Texas, LLC v. Honda Motor Co.*, Case No. 2:15-CV-1274-JRG-RSP, Dkt. No. 146, 2016 WL 4762083 (E.D. Tex. Sept. 13, 2016) ("*Honda*") (attached to Plaintiff's opening brief, Dkt. No. 203, as Ex. A), and *Blitzsafe Texas, LLC v. Subaru Corp.*, Case No. 2:17-CV-421-JRG-RSP, Dkt. No. 109, 2018 WL 6504174 (E.D. Tex. Dec. 11, 2018) ("*Subaru*") (attached to Plaintiff's opening brief, Dkt. No. 203, as Ex. B). Plaintiff also submits that the patents-in-suit have been the subject of twenty-four petitions for *inter partes* review ("IPR"). (Dkt. No. 203 at 1.) Plaintiff submits that only one of those petitions resulted in institution of an IPR (IPR2016-00418), which settled prior to any final decision. (*Id.*)

## II.    Legal Principles

A "claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke,*

*Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

"In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015) (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

To ascertain the meaning of claims, courts look to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. *Id.* A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's invention. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be their own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d

1384, 1388 (Fed. Cir. 1992). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read to limit the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This Court's claim construction analysis is substantially guided by the Federal Circuit's decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their plain and ordinary meaning. *Id.* The plain and ordinary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to, and intended to be read by, others skilled in the particular art. *Id.*

Despite the importance of claim terms, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id.* at 1314–17. As the Supreme Court stated long ago, "in

case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316. Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the United States Patent and Trademark Office ("PTO") understood the patent. *Id.* at 1317. Since the prosecution history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*; *see also Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) ("[A] patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation.").

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193

(Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Phillips*, 415 F.3d at 1319–24. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.*

   *Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. *Id.* at 1323–25. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id.* Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

   The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus,* 134 S. Ct. 2120. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

In general, prior claim construction proceedings involving the same patents-in-suit are "entitled to reasoned deference under the broad principals of *stare decisis* and the goals articulated by the Supreme Court in *Markman*, even though *stare decisis* may not be applicable *per se*." *Maurice Mitchell Innovations, LP v. Intel Corp.*, No. 2:04-CV-450, 2006 WL 1751779, at *4 (E.D. Tex. June 21, 2006) (Davis, J.); *see TQP Dev., LLC v. Intuit Inc.*, No. 2:12-CV-180, 2014 WL 2810016, at *6 (E.D. Tex. June 20, 2014) (Bryson, J.) ("[P]revious claim constructions in cases involving the same patent are entitled to substantial weight, and the Court has determined that it will not depart from those constructions absent a strong reason for doing so."); *see also Teva Pharm.*, 135 S. Ct. at 839–40 ("[P]rior cases will sometimes be binding because of issue preclusion and sometimes will serve as persuasive authority.") (citation omitted); *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008) (noting "the importance of uniformity in the treatment of a given patent") (quoting *Markman*, 517 U.S. at 390).

## III.    Agreed Terms

The parties have submitted the following agreed-upon constructions (Dkt. No. 197, Ex. A; Dkt. No. 203 at 4–7; Dkt. No. 215, App'x A, at 14–19),[2] which the Court adopts:

| Term | Construction |
| --- | --- |
| "integration" / "integrating" <br><br> ('786 Patent, Claims 1, 5, 57, 86) | "connecting one or more external devices or inputs to an existing car radio or stereo via an interface, processing and handling signals and audio channels, allowing a user to control the devices via the car stereo, and displaying data from the devices on the radio" |

---

[2] The term "connectable" appeared as an agreed term in the parties' January 30, 2019 P.R. 4-3 Joint Claim Construction and Prehearing Statement (Dkt. No. 197, Ex. A, at 2 ("Plain and ordinary meaning")), but this term appears as a disputed term in the parties' briefing (Dkt. No. 203 at 25; Dkt. No. 206, at 28; Dkt. No. 208, at 10) and in the parties' April 10, 2019 P.R. 4-5(d) Joint Claim Construction Chart (Dkt. No. 215, App'x A, at 4).

| "integration" / "integrating"<br><br>('342 Patent, Claims 49, 50, 53, 54, 56, 66, 70, 73, 74, 77, 78, 79, 80, 94, 97, 99, 102, 103, 106, 113, 120) | "connecting one or more external devices or inputs to an existing car stereo or video system via an interface, processing and handling signals, audio, and/or video information, allowing a user to control the devices via the car stereo or video system, and displaying data from the devices on the car stereo or video system" |
|---|---|
| "auxiliary input source"<br><br>('786 Patent, Claims 1, 14) | "a device that outputs audio by headphone jack or other connector" |
| "car stereo"<br><br>('786 Patent, Claims 1, 2, 6, 13, 14, 57, 58, 60, 63, 86, 90, 91) | "all presently existing car stereos and radios, such as physical devices that are present at any location within a vehicle, in addition to software and/or graphically-or display-driven receivers. An example of such a receiver is a software-driven receiver that operates on a universal LCD panel within a vehicle and is operable by a user via a graphical user interface displayed on the universal LCD panel. Further, any future receiver, whether a hardwired or a software/graphical receiver operable on one or more displays, is considered within the definition of the terms 'car stereo' and 'car radio.'" |
| "device presence signal"<br><br>('786 Patent, Claims 6, 57, 86; '342 Patent, Claims 56, 106) | "a continuously transmitted signal indicating an audio device is present" |
| "portable"<br><br>('786 Patent, Claim 57; '342 Patent, Claims 49, 52, 53, 54, 56, 57, 62, 63, 64, 66, 70, 71, 73, 76, 77, 78, 80, 94, 95, 97, 100, 101, 103, 106, 109, 110, 111, 113, 115, 120) | "capable of being moved about" |
| "pre-programmed"<br><br>('786 Patent, Claims 1, 7, 8, 57, 60, 86, 90, 91) | Plain and ordinary meaning |

| | |
|---|---|
| "channeling audio signals" / "audio signals . . . are selectively channeled" / "channeling audio" / "channels audio" / "channels video"<br><br>('786 Patent, Claims 1, 14; '342 Patent, Claims 97, 99, 113, 120) | "receiving and transmitting audio" or "receives and transmits [audio/video]" |
| "maintain . . . in an operational state"<br><br>('786 Patent, Claims 57, 86) | "preventing the car stereo from shutting off, entering a sleep mode, or otherwise being unresponsive to signals and/or data from an external source" |
| "maintaining . . . in a state responsive" / "maintain . . . in a state responsive"<br><br>('786 Patent, Claim 6; '342 Patent, Claims 56, 106) | '786 Patent:<br>    "preventing the car stereo from shutting off, entering a sleep mode, or otherwise being unresponsive to signals and/or data from an external source"<br><br>'342 Patent:[3]<br>    "preventing the car audio/video system from shutting off, entering a sleep mode, or otherwise being unresponsive to signals and/or data from an external source" |
| "external"<br><br>('786 Patent, Claims 1, 57, 86; '342 Patent, Claims 49, 73, 97, 120) | "outside and alien to the environment of an OEM or after-market stereo system (and not limited to devices that were not made to work in automobiles)" |
| "car audio/video system"<br><br>('342 Patent, Claims 49–51, 53, 54, 56, 66, 70, 73–75, 77, 78, 94, 97, 99, 106, 113, 120) | Plain and ordinary meaning. |

---

[3] The parties previously agreed upon the same construction for the '342 Patent as for the '786 Patent (Dkt. No. 215, App'x A, at 18), but the parties agreed at the April 24, 2019 hearing that the construction for the '342 Patent should refer to the "car audio/video system" rather than the "car stereo." (*See* Dkt. No. 223 at 4:24–7:7)

| "format incompatible with the [after-market audio device, MP3 player, portable device, video device, portable audio device, car stereo, car audio/video system]"<br><br>('786 Patent, Claims 1, 57, 90;<br>'342 Patent, Claims 53, 57, 77, 97) | "format incompatible with" means "a format not designed to work with" |
|---|---|
| "format incompatible with the [car stereo / car audio/video system]:<br><br>('786 Patent, Claims 1, 60;<br>'342 Patent, Claims 54, 70, 78, 120) | "format incompatible with" means "a format not designed to work with" |

## IV. Disputed Terms

### A. "interface"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a device that includes a microcontroller and that is a functionally and structurally separate component from the car stereo, which integrates an external aftermarket device with a car stereo" | "a device that includes a microcontroller and that is a functionally and structurally separate component from the car stereo and housed separately from the car stereo, which integrates an external aftermarket device with a car stereo" |

(Dkt. No. 197, Ex. B, at p. 3 of 17; *id.* Ex. C, at 1; Dkt. No. 203 at 7; Dkt. No. 206, at 4; Dkt. No. 215, App'x A, at 1.) The parties submit that this term appears in Claims 1, 5, 6, 10, 14, 23, 57, 64, 86, and 88 of the '786 Patent. (*Id.*)

#### (1) The Parties' Positions

Plaintiff submits that it proposes the construction reached by the Court in *Honda* and agreed-upon in *Subaru*. (Dkt. No. 203 at 7.)[4] Plaintiff also submits that "[i]n the *Honda* case, this

---

[4] Plaintiff also submits that its proposal is substantially similar to the construction adopted in *Marlowe Patent Holdings LLC v. Ford Motor Co.*, Civil Action No. 3:11-CV-07044-PGS-DEA, Dkt. No. 110, at 1 (D.N.J. Jan. 16, 2015). (Dkt. No. 203, Ex. C, at 1.)

Court decided, after an extensive review of the intrinsic record, that the interface is not required to be 'external to the "car stereo," or physically separate from the "physical devices" that make-up the "car stereo."'" (*Id.* at 8.) Plaintiff argues that the statements by the Patent Trial and Appeal Board (PTAB) cited by Defendants are not binding on the patentee and are not persuasive. (*See id.* at 9–11.)

Defendants respond that "Blitzsafe's allegations that an integrated head unit device meets the 'interface' limitations, even though a head unit is part of the 'car stereo,' reflects a misunderstanding of the plain meaning of 'functionally and structurally separate' as recited in this Court's prior construction of 'interface.'" (Dkt. No. 206, at 4; *see id.* Ex. 11, Feb. 8, 2019 Infringement Contentions, App'x A-1, at 1 ("interface within the head unit").) Defendants argue that "the PTAB foreclosed a misconception that 'functionally and structurally' separate components could be housed together," and "Defendants' proposal simply incorporates the clarification the PTAB made and prevents any confusion regarding the 'interface' term." (Dkt. No. 206, at 5.) Further, Defendants argue that "[t]he PTAB clarification is confirmed by the '786 patent and its prosecution history." (*Id.*)

Plaintiff replies: "[N]othing in the '786 Patent or its prosecution history requires separate housings for the claimed interface and the car stereo. In fact, neither the car stereo nor the interface is described as having a housing, nor are the terms 'housed' or 'housing' used (much less defined) in the '786 Patent." (Dkt. No. 208, at 1.) Plaintiff argues that "Defendants' argument fails because it assumes the conclusion they seek to prove: that an interface added to an existing car stereo cannot be housed together with the car stereo." (*Id.* at 2.)

(2) Analysis

Claim 1 of the '786 Patent, for example, recites (emphasis added):

1. An audio device integration system comprising:

    a first connector electrically connectable to a car stereo;

    a second connector electrically connectable to an after-market audio device external to the car stereo;

    a third connector electrically connectable to one or more auxiliary input sources external to the car stereo and the after-market audio device;

    an *interface* connected between said first and second electrical connectors for channeling audio signals to the car stereo from the after-market audio device, said *interface* including a microcontroller in electrical communication with said first and second electrical connectors, said microcontroller pre-programmed to execute:

        a first pre-programmed code portion for remotely controlling the after-market audio device using the car stereo by receiving a control command from the car stereo through said first connector in a format incompatible with the after-market audio device, processing the received control command into a formatted command compatible with the after-market audio device, and transmitting the formatted command to the after-market audio device through said second connector for execution by the after-market audio device;

        a second pre-programmed code portion for receiving data from the after-market audio device through said second connector in a format incompatible with the car stereo, processing the received data into formatted data compatible with the car stereo, and transmitting the formatted data to the car stereo through said first connector for display by the car stereo; and

        a third pre-programmed code portion for switching to one or more auxiliary input sources connected to said third electrical connector.

The parties' proposed constructions are identical except that Defendants propose the "interface" must be "housed separately from the car stereo."

In *Honda*, the Court explained:

Plaintiff contends that "[n]othing in the prosecution history . . . excludes any possible structural or functional overlap between the interface and car stereo." This contradicts the arguments made by the patentee during prosecution and the claims themselves, which require a functionally and structurally separate component from the car stereo. To the extent Plaintiff argues that the claimed "interface" and the car stereo are not functionally and structurally separate, the Court rejects this argument.

However, the Court's finding that the "interface" must be functionally and structurally separate from the "car stereo" does not mean the claims necessarily exclude an interface that, for example, is installed behind the dashboard, either at production time or thereafter. The Court's construction does not require the interface to be external to the "car stereo," or physically separate from the "physical devices" that make-up the "car stereo." '786 Patent at col. 5, ll. 1–13. Furthermore, the claims do not require a specific type of connector or connection between the interface and the car stereo. Instead, the intrinsic evidence just says that the "interface" must be functionally and structurally separate from the components or sub-components that make up the "car stereo."

*Honda* at 21 (citation omitted). The Court thus explained in *Honda* that the "interface" need not be housed separately from the car stereo. *Id.*

Defendants have not persuasively supported their arguments that the Court should depart from its finding in *Honda*. For example, although Figures 1–2H of the '786 Patent illustrate the "interface" as being distinct from other components, nothing in these Figures compels requiring a separate housing.

Defendants have cited IPR proceedings in which the PTAB denied institution of an IPR and discussed the "Ido" reference (European Patent Application Publication No. EP 0950570 A2). In particular, the PTAB stated "as we understand Ido, the 'car stereo' and the 'interface' are housed together, there being no structural separation apparent from any disclosure cited by Petitioner." (*See* Dkt. No. 203, Ex. D, IPR2018-01142, Nov. 26, 2018 Decision, at 18; *see id.* at 17–18.) However, the PTAB made this statement in the context of assessing whether the cited reference disclosed an interface with "structural identity separate from the car radio." (*Id.*) The PTAB did not state that separate housings are necessarily required.

Moreover, Defendants have not shown that the PTAB's statements are binding on this Court or that the statements give rise to any estoppel or disclaimer as to Plaintiff. *See Pragmatus AV, LLC v. Yahoo! Inc.*, No. C-13-1176, 2014 WL 1922081, at *4 (N.D. Cal. May 13, 2014) ("Ultimately, what is important here is not what the PTAB said about the claim term . . . but rather

what [the patentee] said about the term in the proceedings before the PTAB and whether any disavowal or estoppel argument may be asserted based thereon."); *see also Adidas AG v. Under Armour, Inc.*, No. 1:14-CV-00130, Dkt. No. 201, at 2 n.1 (D. Del. Dec. 15, 2015) ("The court is not bound by a preliminary claim construction used by the PTAB for the limited purpose of denying an IPR request.").

Defendants have also cited various disclosures in the specification, several of which refer to an "existing" car stereo. *See* '786 Patent at 2:30–32 ("any available port of the car stereo"), 4:46–52 ("the term 'integration' or 'integrated' is intended to mean connecting one or more external devices or inputs to an existing car radio or stereo via an interface"), 6:4–11 ("the interface 20 of the present invention allows for a plurality of disparate audio devices to be integrated with an existing car radio for use therewith"), 8:33–37 ("A plurality of ports . . . are provided for allowing connection of the interface system of the present invention between an existing car radio, an after-market CD player or changer, or an auxiliary input source."), 9:29–32 ("Ports . . . allow the audio device interface system of the present invention to be connected to one or more existing car stereos, such as an OEM car stereo or an after-market car stereo."), 10:36–40 ("Port J1 allows the audio device integration system of the present invention to be connected to one or more existing car stereos.") & 11:21–24 ("Ports J1 and J2 are provided for allowing connection of the integration system of the present invention between an existing car radio and a satellite receiver.").

Although these disclosures reflect, as found in *Honda*, that the "interface" must be distinct from the "car stereo," none of these disclosures refers to a "housing" or otherwise compels finding that the "interface" must be housed separately.

Similarly, Defendants have cited statements by the patentee during prosecution of the '786 Patent. (*See* Dkt. No. 206, Ex. 12, Sept. 5, 2006 Response, at 23 ("[The Falcon reference] is an

entirely different concept than the interface of the present invention, which includes a physical interface device connected between a car stereo system and an external audio source . . . ."); *id.* at 24 (". . . Falcon not only fails to disclose an interface, but it also fails to disclose connecting the interface between a car stereo and a plurality of auxiliary input sources as claimed by Applicant"); *id.* Ex. 13, June 28, 2007 Response, at 36 ("[Miyazaki] clearly is not an interface positioned between and in communication with an after-market, external device and a car stereo . . . ."); *id.* Ex. 14, Sept. 6, 2007 Response, at 31 ("[Kunimatsu] is wholly devoid of any disclosure relating to an interface connectable between a car stereo and an after-market audio device . . . .").)

Here again, although these statements refer to the interface as being distinct from the car stereo, none of these statements refers to a "housing" or otherwise compels finding that the "interface" must be housed separately. *See Honda* at 20–21; *see also Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on *definitive* statements made during prosecution.") (emphasis added).

The Court therefore hereby expressly rejects Defendants' proposal of "housed separately from the car stereo." *See also Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1367 (Fed. Cir. 2008) ("A 'claim is construed in the light of the claim language . . . not in light of the accused device.'") (quoting *SRI Int'l*, 775 F.2d at 1118).

The Court hereby construes **"interface"** to mean **"a device that includes a microcontroller and that is a functionally and structurally separate component from the car stereo, which integrates an external aftermarket device with a car stereo."**

## B. "integration subsystem"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Not subject to 35 U.S.C. § 112(6) (pre-AIA).<br><br>"a subsystem that includes a microcontroller configured to integrate an external device with a car audio/video system" | Subject to 35 U.S.C. § 112(6) (pre-AIA).<br><br>Indefinite.<br><br>Alternatively, for the independent claims:<br>   "subsystem including a microprocessor programmed to perform the flow-diagram of FIG. 24";<br><br>"subsystem"<br>   "system which is subordinate to another system and that is distinct from any other system (e.g., the car audio/video system)" |

(Dkt. No. 197, Ex. B, at p. 2 of 17; *id.* Ex. C, at 1–2; Dkt. No. 203 at 11; Dkt. No. 206, at 7; Dkt. No. 215, App'x A, at 1.) The parties submit that this term appears in Claims 49, 50, 53–57, 66, 70, 73, 74, 77–80, 94, 97, 99, 102, 103, 106, 113, and 120 of the '342 Patent. (*Id.*)

(1) The Parties' Positions

Plaintiff argues that "[t]his Court has twice rejected arguments that 'integration subsystem' is a means-plus-function term," and "[t]here is no reason to depart from the construction of 'integration subsystem' that this Court has previously adopted." (Dkt. No. 203 at 12.) Plaintiff also submits that "[a]s with 'interface,' Defendants again cite to a non-binding and non-preclusive statement by the PTAB in IPR proceedings in an attempt to support reading a limitation into the claims that contravenes a prior construction of this Court." (*Id.* at 13.) Alternatively, Plaintiff argues that "[e]ven if the term 'integration subsystem' were determined to be defined solely by its function," "Defendants' argument fails because Figure 24 describes an algorithm that details the operation of the integration subsystem, and provides sufficiently definite structure for all alleged functions as a whole." (*Id.* at 16.)

Defendants respond that "although the 'integration subsystem' may be found within the broader 'car audio/video system,' as a 'subsystem' it must be distinct from other subsystems (or components) found in the 'car audio/video system.'" (Dkt. No. 206, at 8.) Defendants also argue that "the term 'integration subsystem' is a nonce term to describe the claimed function, and thus the claims fall under [35 U.S.C.] § 112(6)," and "the disclosed structure of the 'integration subsystem' is inadequate to support the claimed function." (*Id.* at 13.)

Plaintiff replies that "the limitation sought by Defendants requiring that the integration subsystem be 'distinct' from the car audio/video system relies on the same portions of the specification that this Court previously found support the opposite conclusion: that the 'integration subsystem' *need not* be functionally and structurally separate from the car audio/video system." (Dkt. No. 208, at 2 (citing *Honda* at 31).)

At the April 24, 2019 hearing, Defendants stated that they no longer assert that 35 U.S.C. § 112(6) or indefiniteness apply to this term.

(2) Analysis

The specification discloses:

As used herein, the term "integration" or "integrated" is intended to mean connecting one or more external devices or inputs to an existing car stereo or video system via an interface, processing and handling signals, audio, and/or video information, allowing a user to control the devices via the car stereo or video system, and displaying data from the devices on the car stereo or video system.

'342 Patent at 8:64–9:3.

In *Honda* and *Subaru*, the Court rejected arguments that "integration subsystem" is a means-plus-function term governed by 35 U.S.C. § 112, ¶ 6, and the Court construed "integration subsystem" to mean "a subsystem that includes a microcontroller configured to integrate an external device with a car audio/video system." *See Honda* at 23–31; *see also Subaru* at 38–47;

'342 Patent at 8:64–9:3, *id.* at 14:4–59 ("Microcontroller DD1 is in electrical communication with each of the ports J4A, J4B, J3, J5L1, J5R1, J1, and J2, and provides functionality for integrating the CD player and auxiliary input source connected to the ports J1 and J2 with the car stereo connected to the ports J4A and J4B or J3.") & 34:63–35:1 ("The integration subsystem 932 contains circuitry similar to the circuitry disclosed in the various embodiments of the present invention discussed herein, and could include a PIC16F872 or PIC16F873 microcontroller manufactured by Microchip, Inc. and programmed in accordance with the flowchart discussed below with respect to FIG. 24.").

Defendants have cited IPR proceedings in which the PTAB denied institution of an IPR and stated that "the integration subsystem is a system distinct from any other system (e.g., the car audio/video system)":

> We conclude that the plain and ordinary meaning of the word "subsystem" as understood by a person of ordinary skill in the art requires that both the "subsystem" and the "system" to which it is subordinate must be "systems." . . . .
>
> Figures 18 and 19, for example, illustrate that integration subsystem 932, 1032 may be subordinate either to portable audio/video device 924 or car audio/video system 1010, depending on where the integration subsystem is located. Ex. 1001 [('342 Patent)], Figs. 18−19; *see also id.* at Figs. 20−23 (similar[l]y depicting or describing the integration subsystem). More particularly, the written description corresponding to Figure 18 provides that for Figure 18, the portable device includes *its own device electronics* ("e.g., circuitry and components provided by the portable device manufacturer") *in addition to* an integration subsystem or module and a wireless interface/transceiver. *Id.* at 34:9−13. For Figure 19, the Specification also states that the car audio/video system includes the integration subsystem *in addition to the car system electronics* ("e.g., circuitry and components provided by an OEM [(original equipment manufacturer)] or after-market car audio and/or video system manufacturer"), wireless interface/transceiver, display, control panel, and an optional external interface port. *Id.* at 33:57−62, 35:21−28. That is, regardless of where it is positioned, the integration subsystem is a system distinct from any other system (e.g., the car audio/video system).

(Dkt. No. 203, Ex. F, Jan. 24, 2017 Decision, at 10 & 11−12.)

Defendants have not shown that the PTAB's statements are binding on this Court or that the statements give rise to any estoppel or disclaimer as to Plaintiff. *See Pragmatus*, 2014 WL 1922081, at *4.

Nonetheless, "[w]here a claim lists elements separately, the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention." *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (citation and internal quotation marks omitted). The claims and the specification demonstrate that the "integration subsystem" is distinct from the "car audio/video system." Claim 1 of the '342 Patent, for example, recites (emphasis added):

> 1. A multimedia device integration system, comprising:
>
> an *integration subsystem* in communication with a portable device, the portable device external to a car audio/video system; and
>
> a first wireless interface in communication with said *integration subsystem*, said first wireless interface establishing a wireless communication link with a second wireless interface in communication with the car audio/video system,
>
> wherein said *integration subsystem* obtains information about an audio file stored on the portable device, *transmits the information over said wireless communication link to the car audio/video system* for subsequent display of the information on a display of the car audio/video system, instructs the portable device to play the audio file in response to a user selecting the audio file using controls of the car audio/video system, and *transmits audio generated by the portable device over said wireless communication link to the car audio/video system* for playing on the car audio/video system.

In this claim, the "integration subsystem" is not only recited distinctly but also is recited as transmitting "*to* the car audio/video system." At the April 24, 2019 hearing, Plaintiff acknowledged that the "integration subsystem" and the car stereo cannot be one and the same. Defendants responded, however, by arguing that the "integration subsystem" cannot share *any* components with the car stereo. (Dkt. No. 223 at 41:8–12.)

In *Honda*, the Court referred to the "integration subsystem" as being "a discrete structure." *Honda* at 29. This does not necessarily mean, however, that the "integration subsystem" must be *separate* from the car audio/video system. As the Court explained in *Honda*:

> [U]nlike the "interface" in the '786 Patent, the intrinsic evidence does not show the "integration subsystem" has to be a functionally and structurally separate component from the "car stereo." Indeed, the '342 Patent indicates that the "integration system" can be included in either the portable device or the car stereo. *See, e.g.*, '342 at col. 34, ll. 9–13 ("The portable device 924 includes . . . an integration subsystem or module 932 positioned within the portable device 924."), col. 35, ll. 23–25 ("In this embodiment, the integration subsystem 1032 is positioned internally within the car system 1010.").

*Id.* at 31.

Finally, Defendants have failed to demonstrate that the integration subsystem cannot share any circuity, software, or other components with the system with which it is included. Neither the above-discussed evidence nor the extrinsic dictionary definitions of "subsystem" cited by Defendants or the PTAB compel otherwise. (*See* Dkt. No. 206 at 9–10 & Exs. 17–18 ("a portion of a system that can be treated as a single element in the main system, but that can also be considered a distinct system itself"; "[a] system which is a part of, or assists, a larger system"; "[a] system which is subordinate to another system"); *see also* Dkt. No. 203, Ex. F, Jan. 24, 2017 Decision, at 10–11.)

The Court therefore hereby construes **"integration subsystem"** to mean **"a subsystem that includes a microcontroller configured to integrate an external device with a car audio/video system."**

## C. ". . . audio generated by . . ."

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "generated by the portable device over the [or said] wireless communication link for playing on the car audio/video system" ('342 Patent, Claims 49, 66, 73, 94):<br><br>    "produced by the portable device, and received by the integration subsystem, as decoded audio signals for playing on the car audio/video system"<br><br>"generated by the portable device to the car audio/video system using the wireless communication link" ('342 Patent, Claims 97, 120):<br><br>    "produced by the portable device, and received by the integration subsystem, as decoded audio signals for playing on the car audio/video system" | "receives audio [video] generated by the portable device over the [or said] wireless communication link for playing on the car audio/video system" ('342 Patent, Claims 49, 66, 73, 94):<br><br>    "receives decoded audio [video] signals produced by the portable device and transmitted using the [or said] wireless communication link for playing on the car audio [video] system without further audio [video] decoding"<br><br>"channels audio generated by the portable device to the car audio/video system using the wireless communication link" ('342 Patent, Claims 97, 120):<br><br>    "transmits decoded audio signals produced by the portable device, and received by the integration subsystem, to the car audio/video system using the wireless communication link for playing on the car audio/video system without further audio decoding" |

(Dkt. No. 197, Ex. B, at pp. 5 & 7 of 17; Dkt. No. 203 at 18; Dkt. No. 206, at 14; Dkt. No. 215, App'x A, at 2–3; *see* Dkt. No. 197, Ex. C, at 4.)

(1) The Parties' Positions

Plaintiff submits that "[t]his construction was offered by the Court at the *Markman* hearing in the *Subaru* matter and accepted by both parties after discussion among the Court and the parties." (Dkt. No. 203 at 18.) Plaintiff argues that "Defendants' proposed constructions are ambiguous and, if adopted, would be unhelpful to a jury." (*Id.* at 19.)

Defendants respond:

Defendants' proposed construction in this case seeks to address the phrase 'audio generated by the portable device' within the broader claim limitation in which it is

found in a manner consistent with the Court's prior construction. Defendants propose this construction because Blitzsafe's infringement contentions demonstrate that it holds a different view from the Court's reasoning in *Subaru* and the plain language of the asserted claims. Specifically, in identifying Bluetooth audio transmitted in conformance with the A2DP profile as meeting the broader "receives . . ." and "channels . . ." claim limitations (Ex. 21, Blitzsafe's Amended Infringement Contentions, dated Feb. 8, 2019, Appendix B-1, pages 23–30, 52), Blitzsafe has left open the potential for *encoded* audio streams to be transmitted over the claimed "wireless communication link." This interpretation contradicts the plain language of the asserted claims, the Court's reasoning in *Subaru* (referenced above), and the statements Blitzsafe made to the Patent Office in IPR2016-00418 (the "Toyota IPR") and IPR2016-0476 (the "Hyundai IPR").

(Dkt. No. 206, at 16.) Defendants argue that "not only must the portable device decode an audio [or video] file, but . . . this same decoded audio [or video] is what must be transmitted over the wireless communications link for ultimate receipt at the integration subsystem (and playback by the car audio/video system)." (*Id.* at 19.)

Plaintiff replies that "[t]he claims themselves do not require that *all* of the audio generated by the portable device be received by the integration subsystem." (Dkt. No. 208, at 4.) Plaintiff also submits that "Defendants cite no evidence for their argument that the language of the '342 Patent claims excludes transmission of encoded audio streams as required by the Bluetooth protocol." (*Id.*) Plaintiff urges that "[i]f the portable device decoded the audio file prior to transmission, then audio generated by the portable device is received by the integration subsystem as required by the claims." (*Id.* at 6.)

(2) Analysis

Claim 49 of the '342 Patent, for example, recites (emphasis added):

49. A multimedia device integration system, comprising:
  an integration subsystem in communication with a car audio/video system; and
  a first wireless interface in communication with said integration subsystem, said first wireless interface establishing a wireless communication link with a second wireless interface in communication with a portable device external to the car audio/video system,

wherein said integration subsystem obtains, using said wireless communication link, information about an audio file stored on the portable device, transmits the information to the car audio/video system for subsequent display of the information on a display of the car audio/video system, instructs the portable device to play the audio file in response to a user selecting the audio file using controls of the car audio/video system, and *receives audio generated by the portable device over said wireless communication link for playing on the car audio/video system.*

In *Subaru*, the Court found that "the patent holder clearly and unambiguously stated in the Toyota IPR and the Hyundai IPR that the audio must be decoded by the portable device, and that the decoded audio must be received by the integration subsystem." *Subaru* at 16. *Subaru* construed "generated by the portable device . . . for playing on the car audio/video system" ('342 Patent, Claims 49, 66, 73, 94, 97, 120) and "generated by the portable device to the car audio/video system . . . for subsequent playing of the audio on the car audio/video system" ('342 Patent, Claims 97, 120) to mean "produced by the portable device, and received by the integration subsystem, as decoded audio signals for playing on the car audio/video system." *Subaru* at 18. The Court also stated:

It should be noted that the adopted construction does not preclude further decoding of other data files by the integration subsystem. Although the patent holder argued that the prior art failed to disclose a system where audio files were at least decoded by the portable device, these arguments were not directed at other data discussed in the specification (e.g., track information, artist information, song title, time information, etc.). Indeed, the specification states that the integration subsystem "receives data generated by the device electronic[s]" and processes the data "into a format compatible with the car system 910." '342 Patent at 34:31–38. Thus, the specification indicates that the integration subsystem does some processing of the data after it is received from the portable device. Likewise, the parties agreed during the claim construction hearing that a digital-to-analog conversion that occurs after the integration subsystem receives decoded audio signals is not precluded by the claims.

*Id.*

Defendants have cited the patentee's statements in the Toyota IPR and the Hyundai IPR that purportedly distinguished using A2DP. What the patentee distinguished, however, was using

A2DP to transmit an "audio file," not using A2DP to transmit decoded audio. For example, the

patentee stated:

> . . . Shibasaki explicitly states that an *audio "file," not generated audio*, is received by the car audio apparatus 10 of Shibasaki. Upon receipt of a playback instruction, Shibasaki teaches that "the MP3 player 20-2 storing the music file transmits the music file corresponding to the given playback instruction" to the car stereo 10 for playback. (Ex. 1006 [(Shibaski)] at 13:46–52.) The decoding of the music file is performed at the data processing section 109, and converting music data into sound for output occurs at the playback section 111—both sections being internal to the car audio apparatus 10. (Ex. 1006 at 10:38–46.)
>
> . . . .
>
> Petitioners mischaracterize the A2DP 1.0 because the reference does not actually disclose "audio signals." Rather, the reference describes audio streams which are defined as streaming audio "data." Data is not "generated audio" because such content must be decoded by the receiving device. Citing to the A2DP 1.0 reference, Petitioners admit that decoding must occur away from the portable device. (Pet. at 72.) However, the A2DP 1.0 reference only explains that audio data is transmitted in a compressed format (i.e., encoded). Accordingly, *the transfer of data is as encoded data files* such as MP3 files. Additional portions in the same section of the A2DP 1.0 reference expressly disclose that the audio stream is in an encoded format at the source SRC and decoded at the sink SNK, which means that audio received at the sink SNK is not generated audio. Ex. 1009 at 16. Additionally, the A2DP 1.0 specification describes transferring MP3 files, and not decoding MP3 files on a portable device prior to sending. (Ex. 1009 at 24.) Thus, A2DP 1.0 does not disclose "audio generated by the portable device" as required by the claims.

(Dkt. No. 206, Ex. 23, Hyundai IPR, Patent Owner's Preliminary Response, at 10–11 & 22–23

(emphasis added); *see id.* Ex. 22, Toyota IPR, Feb. 2, 2017 Hr'g Tr. at 33:15–21 ("those limitations

mean that you have to have the file stored on the portable device in some nonplayable format that

is then played by the portable device generated into audio and the audio sent to the integration

subsystem").) Also of note, A2DP is a Bluetooth wireless communication technology, and the

specification of the '342 Patent refers to using Bluetooth for wireless communication. *See* '342 Patent at 33:62–34:1 & 34:15–18.[5]

Additional statements cited by Defendants are likewise unpersuasive. (*See Subaru* at 16; *see also* Dkt. No. 206, Ex. 22, Toyota IPR, Feb. 2, 2017 Hr'g Tr. at 28:4–29:9 ("what is sent over must be something ready for play"; "the audio file starts off as an audio file and is then transformed in some way, generated by the portable device and not just passed through"), 33:3–35:2, 35:24–37:7, 39:13–40:15 ("[W]hen one of ordinary skill in the art sees streaming, it doesn't necessarily mean sending decoded audio. It could be streaming an MP3 file in chunks. And that's supported by the A2DP Codec which allows you to . . . send MP3 files over [B]luetooth transport to be later decoded from MP3 in a wireless adapter or car stereo.").)

In sum, Defendants have not shown any relevant definitive statements or disclaimer. *See Omega*, 334 F.3d at 1324 ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on *definitive* statements made during prosecution.") (emphasis added).

Because Defendants thus have failed to show any disclaimer as to A2DP or any other relevant disclaimer, the Court adopts the *Subaru* construction. The Court accordingly hereby construes the disputed terms as set forth in the following chart:

---

[5] At the April 24, 2019 hearing, Defendants argued that whereas Bluetooth does not necessarily always use encoding, A2DP necessarily uses encoding. (*See, e.g.*, Dkt. No. 223 at 62:7–12.) To whatever extent this distinction is relevant, Defendants at the hearing were unable to identify any record evidence to support this distinction. Moreover, Defendants failed to demonstrate that the patentee globally disclaimed or distinguished any and all encoding.

| Term | Construction |
|---|---|
| **"generated by the portable device . . . for playing on the car audio/video system"** ('342 Patent, Claims 49, 66, 73, 94)<br><br>**"generated by the portable device to the car audio/video system . . . for subsequent playing of the audio on the car audio/video system"** ('342 Patent, Claims 97, 120) | **"produced by the portable device, and received by the integration subsystem, as decoded audio signals for playing on the car audio/video system"** |

### D. "formatted command," "formatted control command," and "formatted control signal"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "new and different [control] command that is in a format compatible with the [after-market audio device / portable device / MP3 player]" |

(Dkt. No. 197, Ex. B, at p. 4 of 17; *id.* Ex. C, at 3–4; Dkt. No. 203 at 20; Dkt. No. 206, at 20; Dkt. No. 215, App'x A, at 2.) The parties submit that this term appears in Claims 1, 57, 90, and 92 of the '786 Patent and Claims 53, 57, and 97 of the '342 Patent. (*Id.*)

(1) The Parties' Positions

Plaintiff argues that "[a] person of ordinary skill in the art would have reasonable certainty about the scope of the terms 'formatted command,' 'formatted control command,' and 'formatted control signal' in the context of the claims." (Dkt. No. 203 at 20.) Plaintiff also argues that Defendants' proposal of "new and different" "imposes a dual requirement that has no support in the intrinsic record and is ambiguous." (*Id.* at 21.)

Defendants respond that "Defendants' proposed construction adopts statements from the PTAB in the IPR2018-01142, where the PTAB found that a 'formatted command' was not just a new command in any format, but also a different command in a format compatible with the after-market audio device." (Dkt. No. 206, at 20.) Defendants also submit that "[t]he PTAB's statements

are reinforced by the specifications [*sic*]" which "consistently describe a 'formatted command' as a new command that is in a format compatible with the after-market audio device (i.e., 'converted' into a different format)." (*Id.* at 21.)

Plaintiff replies that "[w]hile the formatted command was described as 'new' in the specification in connection with one embodiment, and 'different' by the PTAB in an institution decision, Defendants point to no evidence that the formatted commands have ever been characterized as requiring both characteristics." (Dkt. No. 208, at 8 (citations omitted).) Plaintiff also argues that "[t]he ambiguity that Defendants seek to inject into this claim element counsels against adopting any construction where the claims make clear that a formatted command is one that has processed from a format incompatible with an after-market device into a format which is compatible." (*Id.*)

(2) Analysis

Claim 1 of the '786 Patent, for example, recites (emphasis added):

1. An audio device integration system comprising:
    a first connector electrically connectable to a car stereo;
    a second connector electrically connectable to an after-market audio device external to the car stereo;
    a third connector electrically connectable to one or more auxiliary input sources external to the car stereo and the after-market audio device;
    an interface connected between said first and second electrical connectors for channeling audio signals to the car stereo from the after-market audio device, said interface including a microcontroller in electrical communication with said first and second electrical connectors, said microcontroller pre-programmed to execute:
        a first pre-programmed code portion for remotely controlling the after-market audio device using the car stereo by receiving a control command from the car stereo through said first connector in a format incompatible with the after-market audio device, processing the received control command into a *formatted command* compatible with the after-market audio device, and transmitting the *formatted command* to the after-market audio device

29

through said second connector for execution by the after-market audio device;

a second pre-programmed code portion for receiving data from the after-market audio device through said second connector in a format incompatible with the car stereo, processing the received data into formatted data compatible with the car stereo, and transmitting the formatted data to the car stereo through said first connector for display by the car stereo; and

a third pre-programmed code portion for switching to one or more auxiliary input sources connected to said third electrical connector.

As another example, Claim 25 of the '786 Patent recites (emphasis added):

25. An audio device integration system comprising:

a first electrical connector connectable to a car stereo;

a plurality of auxiliary electrical connectors connectable to a plurality of auxiliary input sources;

an interface connected between said first electrical connector and said plurality of auxiliary electrical connectors for channeling audio from at least one of the plurality of auxiliary input sources to the car stereo, said interface including a microcontroller in electrical communication with said first electrical connector and said plurality of auxiliary electrical connectors, said microcontroller pre-programmed to execute:

a first pre-programmed code portion for remotely controlling at least one of the plurality of auxiliary input sources using the car stereo by receiving a control command from the car stereo through said first electrical connector in a format incompatible with at least one of the plurality of auxiliary input sources, processing a received control command into a *formatted control command* compatible with at least one of the plurality of auxiliary input sources, and transmitting a *formatted control command* to at least one of the plurality of auxiliary input sources through at least one of said plurality of auxiliary electrical connectors for execution by at least one of the plurality of auxiliary input sources;

a second pre-programmed code portion for receiving data from at least one of the plurality of auxiliary input sources through at least one of the said plurality of auxiliary electrical connectors in a format incompatible with the car stereo, processing the received data into formatted data compatible with the car stereo, and transmitting the formatted data to the car stereo through

30

> said first electrical connector for display by the car
> stereo; and
>> a third pre-programmed code portion for selecting one of the
>> plurality of auxiliary input sources from the car stereo.

The claims thus recite commands, from the car stereo, that are incompatible with an after-market audio device or an auxiliary input source. Those control commands are then processed so as to produce "formatted" commands that are compatible with the after-market audio device or auxiliary input source. *See, e.g.,* '342 Patent at 18:5–7 ("the received command is converted into a format recognizable by the MP3 player connected to the present invention"). In *Honda*, "[t]he Court agree[d] with Plaintiff that a person of ordinary skill in the art would understand 'compatible' to mean[] 'designed to work with another device or system without modification.'" *Honda* at 58. In the present case, the parties have agreed that "format incompatible with" means "a format not designed to work with." (Dkt. No. 215, App'x A, at 19.)

The specifications of the patents-in-suit disclose that commands can be in particular formats and that operations can be performed on the commands so as to give rise to "new" commands:

> The code portion shown in Table 1 receives a STOP command issued by a BMW stereo, in a format proprietary to BMW stereos. Preferably, the received command is stored in a first buffer, such as BMW_Recv_buff. The procedure "Encode_RD_stop_msg" repetitively applies an XOR function to the STOP command, resulting in a *new* command that is in a format compatible with the after-market CD player.

'786 Patent at 17:63–18:2 (emphasis added); '342 Patent at 22:50–59 (same).

> Any conceivable command from any type of car radio can be formatted for use by an MP3 player of any type or manufacture. Once the command has been formatted, . . . the formatted command is transmitted to the MP3 player and executed.
>
> . . . .
>
> In the code portion show in Table 3, a "Play" command selected by a user at the controls of a Ford OEM car stereo is received, and portions of the command are

stored in one or more buffer arrays. Then, as shown below in Table 4, the decoded portions of the command stored in the one or more buffer arrays are used to *construct* a "Play/Pause" command in a format compatible with the Apple iPod device, and the command is sent to the Apple iPod for execution thereby.

'342 Patent at 18:10–14 & 24:15–23 (emphasis added); *see* '786 Patent at Abstract ("Control commands generated at the car stereo are received, processed, converted in to a format recognizable by the audio device, and dispatched to the audio device for execution.").

Defendants have emphasized statements by the PTAB during *inter partes* review proceedings as to the '786 Patent:

> The claim language requires both a received control command and a formatted control command. The required "formatting" is for making the control command compatible with the after-market audio device or MP3 player. For instance, claim 1 states that the processing of the received command (from the car stereo) results in a "formatted command compatible with the after-market audio device." The specification further describes this "formatted command" as a "*new* command that is in a format compatible with the after-market CD player" because the car stereo command is in a proprietary format not understandable to the CD changer.
>
> . . . .
>
> Thus, as the claims require, the received command (from the car stereo) must be different from the formatted command (issued to the device), and neither Ido's disclosures nor Petitioner's explanation of those disclosures explains that the control command from the car stereo is different in any material way from the command that the MP3 player or after-market audio device understands. Alleging a conversion from USB format to another data bus format *alone* is not enough to meet this limitation, because with either format, the same command may be transmitted. There is no evidence in either Herley or Ido of the command itself being converted to another command for the sake of compatibility with the device.

(Dkt. No. 206, Ex. 10, IPR2018-01142, Nov. 26, 2018 Decision, at 15–16.)

Although the PTAB thus characterized the disclosure in the specification of a "new" command as requiring a "different" command, including both of these words ("new" and "different") in the Court's construction would tend to confuse rather than clarify the scope of the claims. Instead, the specification explains that a change in format gives rise to a "new" command

(as set forth above), and surrounding claim language (such as reproduced above) already provides context for understanding that the new command must be in a different format ("compatible" rather than "incompatible").

The Court therefore hereby construes **"formatted command," "formatted control command,"** and **"formatted control signal"** to mean **"new [control] command that is in a format compatible with the [after-market audio device / portable device / MP3 player]."**

**E. "after-market [audio/video] device"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning<br><br>Alternatively:<br>   "an [audio/video] device that is not included in an automobile as sold by the original equipment manufacturer"[6] | "[audio/video] equipment lacking the specifically designed wiring harness configured for use with the custom designed connectors positioned throughout the vehicle"[7] |

(Dkt. No. 203 at 21; Dkt. No. 206, at 23; Dkt. No. 215, App'x A, at 2.) The parties submit that this term appears in Claims 1, 4, 5, 7, 8, 10, 23, 26, and 86 of the '786 Patent. (*Id.*)

At the April 24, 2019 hearing, the parties stated that they have reached agreement that the Court should adopt the construction proposed by Defendants. (Dkt. No. 223 at 7:8–9:12.)

In accordance with the agreement reached by the parties, the Court hereby construes **"after-market [audio/video] device"** to mean **"[audio/video] equipment lacking the**

---

[6] In the parties' January 30, 2019 P.R. 4-3 Joint Claim Construction and Prehearing Statement, Plaintiff proposed "[audio/video] equipment lacking the specifically designed wiring harness configured for use with the custom designed connectors positioned throughout the vehicle." (Dkt. No. 197, Ex. B, at p. 4 of 17.)

[7] Defendants previously proposed: "[audio/video] equipment lacking specifically-designed wiring configuration for use only with custom designed connectors in the vehicle for that purpose." (Dkt. No. 197, Ex. C, at 4.)

specifically designed wiring harness configured for use with the custom designed connectors positioned throughout the vehicle."

## F. "video information"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "visual images" | Plain and ordinary meaning |

(Dkt. No. 197, Ex. B, at p. 14 of 17; *id.* Ex. C, at 11; Dkt. No. 203 at 24; Dkt. No. 206, at 26; Dkt. No. 215, App'x A, at 3.) The parties submit that this term appears in Claims 10 and 86 of the '786 Patent. (*Id.*)

At the April 24, 2019 hearing, the parties stated that they have reached agreement that the Court should adopt the construction proposed by Plaintiff. (Dkt. No. 223 at 7:8–9:12.) The parties also clarified that their agreement as to the disputed term encompasses "one or more" visual images. (*Id.* at 8:17–9:12.)

In accordance with the agreement reached by the parties, the Court hereby construes **"video information"** to mean **"visual images."**

## G. "connector electrically connectable to," "electrical connector," and "connectable"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a port that links separate components" |

(Dkt. No. 197, Ex. B, at p. 15 of 17; *id.* Ex. C, at 12; Dkt. No. 203 at 25; Dkt. No. 206, at 28; Dkt. No. 215, App'x A, at 4.) The parties submit that this term appears in Claims 1, 2, 4, 5, 57, 86, and 97 of the '786 Patent. (*Id.*)

<u>(1) The Parties' Positions</u>

Plaintiff argues that "[i]n view of the guidance in the claims and specification, and given this Court's prior construction, it is unnecessary to construe these terms because they are readily understood by one of ordinary skill in the art." (Dkt. No. 203 at 25.)

Defendants respond that "the core of the claimed invention in the '786 patent is an 'interface' that is connected *between* two already existing components—a 'car stereo' and an 'after market audio device,'" and "[t]he '786 patent requires electronic connectors to link these functionally and structurally separate claim elements, i.e., the 'interface,' 'car stereo,' and 'after market audio device.'" (Dkt. No. 206, at 28 (citations omitted).) Defendants argue that "the '786 patent claims and specification emphasize that 'electrical connectors,' i.e., 'ports,' link distinct components." (*Id.* at 29.)

Plaintiff replies that "Defendants fail to address why the 'connector' terms require construction and why these terms should be limited to an embodiment in the specification: a 'port.'" (Dkt. No. 208, at 10.) Plaintiff also argues that "this Court has already construed 'interface' to be separate from the car stereo and after-market audio device to which it is connected through electrical connectors," and "[a]n additional 'separateness' limitation within this term would render that aspect of the 'interface' construction superfluous." (*Id.*)

<u>(2) Analysis</u>

Claim 1 of the '786 Patent, for example, recites (emphasis added):

1. An audio device integration system comprising:
    a first *connector electrically connectable to* a car stereo;
    a second *connector electrically connectable to* an after-market audio device external to the car stereo;
    a third *connector electrically connectable to* one or more auxiliary input sources external to the car stereo and the after-market audio device;
    an interface connected between said first and second *electrical connectors* for channeling audio signals to the car stereo from the after-market audio device,

said interface including a microcontroller in electrical communication with said first and second *electrical connectors*, said microcontroller pre-programmed to execute:

> a first pre-programmed code portion for remotely controlling the after-market audio device using the car stereo by receiving a control command from the car stereo through said first connector in a format incompatible with the after-market audio device, processing the received control command into a formatted command compatible with the after-market audio device, and transmitting the formatted command to the after-market audio device through said second connector for execution by the after-market audio device;

> a second pre-programmed code portion for receiving data from the after-market audio device through said second connector in a format incompatible with the car stereo, processing the received data into formatted data compatible with the car stereo, and transmitting the formatted data to the car stereo through said first connector for display by the car stereo; and

> a third pre-programmed code portion for switching to one or more auxiliary input sources connected to said third *electrical connector*.

In *Honda*, the Court construed these disputed terms to have their plain and ordinary meaning. *See Honda* at 61–65. In *Subaru*, the parties agreed. *Subaru* at 14.

As to Defendants' proposal of construing these terms to mean "a port that links separate components," Defendants have cited recitals of "channeling" signals from one device to another, such as in Claims 1 and 25 of the '786 Patent. To whatever extent a particular claim recites communication between distinctly recited components, the separation between those components is already set forth by explicit claim language and need not be included in a construction of the present disputed terms. Defendants have also cited various disclosures regarding an "interface" between a car stereo and an after-market audio device (*see* '786 Patent at 4:46–52, 6:4–11 & 8:33–37 & Figs. 1–2H), but Defendants have failed to demonstrate that the presence of an "interface"

necessarily implies the presence of a "connector" between separate components. Also, the parties have presented "interface" as a separate disputed term, which is addressed above.

As to Defendants' proposal of requiring a "port," the specification refers to "connectors" that are "illustratively indicated as ports," and "[e]ach of these ports could be embodied by any suitable electrical connector known in the art." '786 Patent at 9:27–34; *see id.* at 8:31–64 (similar); *see also id.* at 10:47–48 ("Of course, any number of auxiliary input sources and ports/connectors could be provided."). The specification does not limit an "electrical connector" to being a "port." Defendants submit that the specification discloses no other type of electrical connector, but the Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips*, 415 F.3d at 1323.

Finally, Defendants have cited statements by the PTAB when denying institution of an *inter partes* review of the '786 Patent. In a discussion regarding the "Herley" reference (United States Patent Application Publication No. 2005/0262528), the PTAB stated that "[t]he mere existence of communication between the tuner and the controller is not evidence of a 'connector.'" (Dkt. No. 206, Ex. 10, IPR2018-001142, Nov. 26, 2018 Decision, at 21.) The PTAB also stated that "there is no explanation for how or why [a] generic computer bus would provide a connector to the tuner." (*Id.*)

To whatever extent these statements by the PTAB can be interpreted as stating that a "connector" necessarily "links separate components" (as set forth in Defendants' proposed construction), Defendants have not shown that the PTAB's statements are binding on this Court or that the statements give rise to any estoppel or disclaimer as to Plaintiff. *See Pragmatus*, 2014 WL 1922081, at *4.

The Court therefore hereby expressly rejects Defendants' proposed construction, and no further construction is necessary, particularly in light of the disclosure that electrical "connectors" are "known in the art" ('786 Patent at 9:27–34). *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction."); *ActiveVideo Networks, Inc. v. Verizon Commcn's, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012); *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015).

The Court accordingly hereby construes **"connector electrically connectable to," "electrical connector,"** and **"connectable"** to have their **plain and ordinary meaning**.

## V. Additional Terms

The parties have identified additional terms for construction that were disputed in *Subaru* but as to which the parties are presenting no new arguments in the present case. (*See* Dkt. No. 215, App'x A, at 5–13; *see also* Dkt. No. 200, at App'x A.) As to these terms, the Court has incorporated the claim construction briefing in *Subaru* as well as the oral arguments presented in *Subaru*. (*See* Dkt. No. 207, Apr. 1, 2019 Order.) These terms are:

> "a first pre-programmed code portion for remotely controlling the after-market audio device using the car stereo by receiving a control command from the car stereo through said first connector in a format incompatible with the after-market audio device, processing the received control command into a formatted command compatible with the after-market audio device, and transmitting the formatted

command to the after-market audio device through said second connector for execution by the after-market audio device" ('786 Patent, Claim 1);

"a first pre-programmed code portion for generating a device presence signal and transmitting the signal to the car stereo to maintain the car stereo in an operational state" / "a first pre-programmed code portion for generating a device presence signal and transmitting the signal to the car stereo through said first electrical connector to maintain the car stereo in an operational state responsive to signals generated by the after-market video device" ('786 Patent, Claims 57, 86);

"a second pre-programmed code portion for receiving data from the aftermarket audio device through said second connector in a format incompatible with the car stereo, processing the received data into formatted data compatible with the car stereo, and transmitting the formatted data to the car stereo through said first connector for display by the car stereo" ('786 Patent, Claim 1);

"a third code portion for receiving data from the video device incompatible with the car stereo, processing received data into formatted data compatible with the car stereo, and transmitting formatted data . . ." ('786 Patent, Claim 91);

"a second pre-programmed code portion for remotely controlling the MP3 player using the car stereo by receiving a control command from the car stereo through said first electrical connector in a format incompatible with the MP3 player, processing the control command into a formatted control command compatible with the MP3 player, and transmitting the formatted control command to the MP3 player through said second electrical connector for execution by the MP3 player" ('786 Patent, Claim 57);

"a third preprogrammed code portion for switching to one or more auxiliary input sources connected to said third electrical connector" ('786 Patent, Claim 1);

"a second code portion for receiving a control signal from the car . . ., processing a received control signal . . ., and transmitting the formatted control signal . . ." ('786 Patent, Claim 90); and

"a third code portion for receiving data from the MP3 player . . ., processing received data . . ., and transmitting formatted data . . ." ('786 Patent, Claim 60).

(Dkt. No. 215, App'x A, at 5–13.)

The parties have presented no basis for the Court to depart from the conclusions reached in *Subaru* as to these terms. *See Subaru* at 19–38. The Court therefore hereby adopts its reasoning in *Subaru* and construes these terms to have their **plain and ordinary meaning**.

## VI. Conclusion

The Court **ADOPTS** and **ORDERS** the constructions set forth in this opinion for the disputed terms of the patents-in-suit, and in reaching conclusions the Court has considered extrinsic evidence. The Court's constructions thus include subsidiary findings of fact based upon the extrinsic evidence presented by the parties in these claim construction proceedings. *See Teva*, 135 S. Ct. at 841.

The parties are **ORDERED** that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

Within thirty (30) days of the issuance of this Claim Construction Memorandum and Order, the parties are hereby **ORDERED**, in good faith, to mediate this case with the mediator agreed upon by the parties. As a part of such mediation, each party shall appear by counsel (with lead and local counsel present and participating) and by at least one corporate officer possessing sufficient authority and control to unilaterally make binding decisions for the corporation adequate to address any good faith offer or counteroffer of settlement that might arise during such mediation. Failure to do so shall be deemed by the Court as a failure to mediate in good faith and may subject that party to such sanctions as the Court deems appropriate. No participant shall leave the mediation without the approval of the mediator.

**So ORDERED and SIGNED this 22nd day of May, 2019.**

_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE